BOUND vs. THE WISCONSIN CENTRAL RAILROAD COMPANY and others.

STATUTES. *(1, 2) Evidence of their legal enactment. (3, 4) Rules of construction to save their constitutional validity. Ch. 126 of 1869 (enabling counties, etc., to vote railroad aid) held valid.*

1. The publication of an act in the volume of session laws of the year in which it purports to have been approved, verified by the secretary of state, creates a presumption that it became a law pursuant to the requirements of the constitution.

2. Where the journal of a branch of the legislature, published as required by

the constitution, gives a list of the numbers and titles of numerous bills in immediate succession, followed by the words, "*was* read a third time," etc.: *Held*, that the word "was" is an obvious clerical error for "were," and the journal is evidence that *all* the bills named in such list were read a third time.

3. A statute will be so construed, if possible, as to reconcile it with the constitution.

4. Ch. 126 of 1869 (as amended by ch. 31 of 1871) provides that the proper officers of any county through which a certain railroad shall run, etc., may levy a tax and issue bonds of the county to aid in the construction of any portion of such road, and for the purchase of right of way and depot grounds, " upon such terms and conditions as shall be agreed upon " between such county and the railroad company (sec. 1): that when the company shall require aid from any county, it shall make a written proposition, stating (among other things) " the terms, conditions *and considerations* " upon which the money or bonds of the county will be required to be paid and delivered to the company (sec. 2); and that all shares of the *capital stock, or bonds, or other securities* given by the railroad company to any county, may be taken, held, sold, etc., by such county in the same manner and with like effect as can be done by individuals (sec. 7). *Held*,

   (1) That, construing the statute together, it requires by its terms some " consideration " moving from the railroad company to the municipality voting aid.

   (2) That it authorizes the municipality to issue its bonds in payment of a subscription for capital stock of the company.

   (3) That the power of granting aid by the issue of municipal bonds " on such terms, conditions and considerations " as the municipality and the railroad company may agree upon, must be understood of *lawful* terms and considerations— such a power as may be exercised by a municipality within the limits of the constitution; and the act itself, and bonds issued under it by a municipality to pay for stock subscribed in aid of a railroad, are held valid.

5. Under said act, the railroad company made a proposal in writing to the town of P., that it would build a road from Stevens Point to Portage City on a certain route (about 76 miles), provided the municipal corporations along or adjacent to the route should vote to take $300,000 of the stock of the company in exchange for their corporate bonds to a like amount; and it proposed that said town of P., which was on the proposed line, should take $20,000 of said stock, payment therefor to be secured as follows: as soon as the electors of the town should by vote have accepted the proposition, the town officers were to immediately subscribe for said stock, and to execute coupon bonds of the town for the same amount, payable to bearer, and to deliver them to a certain bank in trust to be delivered to the company on certain conditions, viz.: whenever the company should have built and made ready for use a continuous

railway from Stevens Point through said town; should have constructed depot buildings there; should have delivered, within sixty days after the acceptance of said proposition, to the chairman of said town, for execution, said bonds; should have deposited 200 shares of its stock in said trustee bank to the credit of said town; and should have obtained a certain certificate that the road had been so constructed — it should become entitled to receive said bonds, with coupons for the interest subsequently to accrue. The written proposal further stated that "this proposition, except as to the amount, is also submitted to other municipal corporations on and adjacent to said line of road, and is upon the express condition that said railroad company shall not be bound to construct any portion of its proposed road unless said municipal corporations shall agree to take $300,000 in the aggregate of the company's stock, and shall issue and deposit with said trustee their bonds to a like amount; and that, if said road shall not be commenced within six months after said sum of $300,000 of stock shall have been subscribed by said municipal corporations, and the bonds therefor issued and deposited with said trustee to that amount, or the whole line shall not be built within two years from the deposit of such bonds with the trustee, the town officers may, in their discretion, withdraw the bonds and surrender the stock. It further provides that, "upon the delivery of said bonds to such trustee as aforesaid," the company shall immediately make and deliver to the trustee full-paid certificates of its stock to the amount subscribed by the town, to be delivered to the town on delivery of the bonds of the town to the company by the trustee. The town of P. accepted the proposition, but, although the proposition was submitted to the other municipal corporations mentioned therein, they had, prior to November, 1874, refused to subscribe for $300,000 of stock in the aggregate, and have never subscribed for over $184,500 of such stock. Between September 1, 1873, and September 1, 1874, the company graded six miles of its road from Stevens Point, none of which grading was in said town, and this work was done in reliance upon subscriptions so made for its stock. In November, 1874, the constitution of this state was so amended as to prohibit towns from becoming indebted to a greater amount than five per cent. upon the assessed value of the taxable property therein; and the sum of $20,000 was much more than the assessed value of taxable property in the town of P. The company had deposited with the trustee its certificates of stock as specified in its proposition in May, 1872; and in July, 1875, it requested the officers of the town to make a subscription to its stock and issue the town bonds; and, upon their refusal, it sued out and served on them an alternative writ of *mandamus* to compel them so to do; and, after the court had refused to quash the writ, and determined that a peremptory writ should issue within twenty days unless the officers should make due return to the first writ, they issued bonds of the town January 1, 1876, and delivered them to the trustee. In October, 1875, work was resumed on the line of road, and the same was completed and in operation in Janu-

uary, 1876, and has ever since been in full operation, running through said town as proposed. Upon the trustee being furnished with the required evidence of such completion, the bonds were delivered to the company, and the certificates of stock to the town. In an action to have the bonds declared void: *Held*, that there was a valid contract between the town and the railroad company, which was not affected by the constitutional amendment of 1874, or the provisions of ch. 317, Laws of 1874; and that the bonds are valid.

[RYAN, C. J., acquiescing in the judgment on other grounds, holds, 1. That municipalities in this state can take power to levy taxes in aid of railroads owned by private corporations, only by way of becoming stockholders therein. *Whiting v. Railroad Co.*, 25 Wis., 167. 2. That a legislative grant of power for either of two purposes, at the election of the grantee, one purpose being lawful and the other unlawful, is void. *Att'y Gen. v. Eau Claire*, 37 Wis., 400. 3. That the act of 1869 (as amended) cannot be construed as limiting the power of taxation conferred, to payment for a stock subscription, or as limiting it at all except by requiring *some* consideration from the company; and it is therefore void, and bonds issued under it, though in fact for stock subscriptions, invalid.]

APPEAL from the Circuit Court for *Portage* County.

This action was brought by the plaintiff in his own behalf, and in behalf of all others in like interest, against *The Wisconsin Central Railroad Company, The Town of Plainfield*, and others, to have a subscription by said town to the capital stock of said company adjudged void, and bonds of the town, issued in payment for said stock, cancelled.

About January 8, 1872, the defendant railroad company submitted to the *Town of Plainfield* the following proposition:

" The *Wisconsin Central Railroad Company* proposes to construct a line of railroad from Stevens Point, in the county of Portage, to Portage, in the county of Columbia, a distance of about seventy-six miles, provided the municipal corporations along or adjacent to said railroad shall vote to take, and [shall] take, the stock of the company to the amount of three hundred thousand dollars, in exchange for their corporate bonds to be issued in like amount to this company; and the said *Wisconsin Central Railroad Company* proposes to the *Town of Plainfield*, in the county of Waushara, to take two hundred shares of one hundred dollars each (being twenty

thousand dollars in the aggregate) of the common stock of said company, and to secure payment thereof in the manner and on the terms hereinafter mentioned.

"*First.* This proposition shall be submitted to a vote of the legal voters of said town in the manner prescribed in and by [ch. 126 of 1869], and the several acts amendatory thereof.

"*Second.* If a majority of the legal voters voting on that subject at such election in said town, shall vote in favor of such proposition, then it shall be the duty of the proper officers, to wit, the chairman of the board of supervisors and the town clerk of said town, without delay, for and in behalf of said town to subscribe for two hundred shares of the said stock of said company, of one hundred dollars each (being twenty thousand dollars in the aggregate), and to secure payment of the stock so subscribed at par by the bonds of said town payable to bearer; and for that purpose they shall duly execute under their hands and seals twenty bonds of said town of one thousand dollars each (being for the principal sum of twenty thousand dollars in the aggregate), in the usual form of corporation bonds intended to pass as commercial paper, dated March 1, 1872, bearing interest at the rate of eight per cent. per annum, payable in equal semi-annual installments, with suitable coupons or interest warrants attached; the principal sums payable on the first day of March, 1892, with the privilege of redemption after March 1, 1882, and both principal and interest payable to bearer at some specified place in the city of New York or city of Boston; and said bonds shall be immediately perfected and delivered by said officers of said town to the National Exchange Bank in the city of Boston, in trust to be delivered to said railroad company as hereinafter directed. Whenever said company shall have built and made ready for use a continuous railway from the city of Stevens Point through said town in the county of Waushara; shall have constructed depot buildings within three-fourths of a mile of Sherman Bradwell's store in the village of Plainfield; shall have delivered, within sixty days after the acceptance of this proposition, to the chairman of said town, for execution, the

said bonds; shall have deposited two hundred shares of its said stock in said bank to the credit of said town; and shall have obtained the certificate of the chairman of the board of supervisors of said town, or of the secretary of state of the state of Wisconsin, that said road has been so constructed — it shall become entitled to receive said bonds, with the interest coupons thereon to become due from and after the time cars shall have been run over the said road from Stevens Point through said town; and the past-due interest coupons shall be cancelled and returned by the trustee to the treasurer of said town. And it shall be the duty of the trustee with whom said bonds are deposited in trust as aforesaid, to deliver said bonds to the president of said company, or to such other person as the board of directors of said company shall authorize to receive the same.    This proposition, except as to amount, is also submitted to other municipal corporations on and adjacent to said line of road, and is upon the express condition that said railroad company shall not be bound to construct any portion of its proposed road between Portage City and Stevens Point unless said municipal corporations shall agree to take the common stocks of said company to the amount in the aggregate of three hundred thousand dollars, and shall issue and deposit with said National Exchange Bank their bonds to a like amount in exchange therefor, and if the said road shall not be commenced within six months after the said sum of three hundred thousand dollars of stock shall have been subscribed by said municipal corporations, and the bonds therefor issued and deposited with said bank to said amount of three hundred thousand dollars, or shall not be built from Stevens Point to Portage City within two years from the deposit of such bonds with the trustee as aforesaid, the town board of said town may in their discretion withdraw said bonds from said trustee and surrender said stock, unless such town shall have consented to extend the time for the completion of the road to the point aforesaid.

"Upon the due execution and delivery of said bonds to such trustee as aforesaid, the said *Wisconsin Central Railroad Company* shall immediately make and deliver to the said

trustee full-paid certificates of the stock of the company for said full amount thereof so subscribed by or on behalf of said town; and whenever said trustee shall deliver any of said bonds to said company, he shall on request thereafter deliver to the treasurer or other authorized agent of said *Town of Plainfield*, for the use of that town, an equal amount of the full-paid certificates of stock of said company."

At an election regularly held by the legal voters of the defendant town, January 31, 1872, a majority of the votes cast was in favor of the above proposition. In May following, certificates of stock in the defendant company's road were deposited with the trustee bank, " as specified in the proposition;" but no bonds of the defendant town had then been issued, nor does it appear from the findings herein that they had been demanded. About September 1, 1873, the work of grading and constructing the line of road described in the proposition was begun, and was continued thereafter until September 1, 1874, when there had been graded six miles of said road south from Stevens Point, together with side tracks belonging thereto; but no grading had been done in the town of *Plainfield*, nor in the county of Waushara (in which that town is situate), nor had any other grading than that mentioned been done at that time on the proposed line, and the grading upon the six miles was not continuous or completed.

Prior to November, 1874, the railroad company's proposition for aid (similar in each case to that above stated, except as to amount), was submitted to other municipal corporations on and adjacent to said line of road, and was rejected by some of them; " and such municipalities, prior to said last date, had refused to subscribe to the sum of $300,000 in the aggregate, and had in fact only subscribed $184,500; and no further subscriptions have since been made by said municipal corporations."

In November, 1874, sec. 3, art. XI of the constitution of this state was amended so as to declare that " no county, city, town, village, school district, or other municipal corporation, shall be allowed to become indebted in any manner or for any

purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness." The value of all the taxable property in the defendant town, in November, 1875, ascertained in the manner above described, was $95,852, and its assessed valuation had never exceeded that sum in any previous year.

In February, 1875, the board of supervisors of the defendant town passed a resolution for re-submitting to the electors of said town, on the 6th of April following, the same proposition which had been voted upon on the 31st of January, 1872, and said election was conducted, etc., in the manner prescribed by ch. 317, Laws of 1874, and a majority of the votes cast upon that subject were against the proposition.[1]

[1] Ch. 317 of 1874, entitled "An act to amend ch. 182 of the general laws of 1872, entitled 'An act to authorize municipal corporations to aid in the construction of railroads,' " contains the following among other provisions, which are constituted additional sections of the amended act:

"Section 3. In all cases where a county, town, city or village shall have subscribed or voted to subscribe, . . . for stock in aid of the construction of any railroad, upon a proposition . . . submitted by any railroad company, wherein the time is stated within which such railroad company has proposed to perform any acts in the construction of any railroad, or initiatory to such construction or otherwise, or in relation to the final completion thereof as proposed, and such railroad company has failed, neglected or refused . . . to perform all of such acts, or any of them, within the time stated in such proposition, it shall be lawful for such county, town, city or village to rescind such proposition, vote, aid or subscription by a vote of the people of such county, town, city or village."

Sec. 4 relates to a case where the railroad proposition was one "stating no time" within which the company should "earn such aid," and where the company had "neglected or refused for the period of one year from the taking of such vote, to accept such rate [aid?] and receive such subscription;" and it declares that in such case it shall be lawful for the county, town, city or village "to rescind such proposition and vote" in the manner described in the previous section.

Secs. 5 and 6 prescribe the manner in which a new election may be called and held, to vote upon the same proposition originally accepted, in the cases defined in the previous sections; and it is declared that if a majority of all the votes cast at such new election shall be against the proposition, the original vote upon such proposition shall be held and declared rescinded, and shall have no binding force, etc.

About July 13, 1875, the company requested the proper officers of the defendant town to make a subscription and issue bonds as specified in the proposition, and made proper tender of the company's books for the purpose of such subscription; but the officers of the town neglected and refused so to do. Thereupon, on the day last mentioned, the company obtained from said circuit court an alternative writ of *mandamus* to compel the town officers to subscribe for the stock and issue the bonds; and a motion to quash such writ was denied about December 3, 1875, and an order made requiring the town officers to make return to said writ within twenty days, or that in default thereof a peremptory writ should issue. About January 1, 1876, said town officers executed and deposited with the trustee the bonds, and subscribed for the specified amount of stock; and this they did in pursuance of an understanding and agreement with the railroad company, by which the latter agreed in that event to pay, and in accordance with which it did in fact pay, the costs of the *mandamus* proceeding.

Meantime, to wit, in October, 1875, work was resumed by the company on said line of road; and it was continued until about January 12, 1876, when the whole line as proposed was completed; and since the date last mentioned, the whole road from Stevens Point to Portage City, running through the town of *Plainfield*, has been in full operation. After that date, and after the required evidence of the completion of the road had been furnished to the trustee bank, the bonds of said town, with the subsequently maturing coupons annexed, were delivered by the trustee to the railroad company, and the corresponding certificates of stock were delivered to the chairman of the town, and by him to the treasurer thereof, about February 11, 1877.

The bonds of the town above mentioned were twenty in number, each for $1,000, and each showing on its face that it was one of a series amounting in the aggregate to $20,000, and that it was issued in pursuance of the vote first above described, under ch. 126 of 1869, ch. 31, Laws of 1871, and ch. 27, P. & L. Laws of 1871.

All work in grading and constructing said road, as above described, was done on the faith and credit of the aid voted by the defendant town and other municipal corporations along the line of said road, and in the belief that the bonds in question would be issued and delivered to the company.

The foregoing statement (except as to the constitutional amendment and statutes) is made from the findings of fact filed by the circuit judge, to which no exception was taken. Other facts found are omitted here, as not having any apparent bearing upon the decision of this court.

From a judgment dismissing the complaint, plaintiff appealed.

*Henry Hayden*, for the appellant, contended, 1. That ch. 126 of 1869 does not appear by the journal of the Assembly of 1869 ever to have passed that body, or to have gone beyond a third reading, and hence does not appear ever to have become a law. 2. That said act, as amended by ch. 31 of 1871, was unconstitutional in that it authorized a *donation of aid* by the municipal corporations therein mentioned, and *did not authorize a subscription by them for the stock* of the defendant company. *Whiting v. Railroad Co.*, 25 Wis., 185; *Rogan v. Watertown*, 30 id., 259; *Gould v. Sterling*, 23 N. Y., 439; *Oebricke v. Pittsburg*, 5 Pa. L. J., 4, 485. Section 7 of the act is the only one which refers in any manner to stock of the company; but it does not itself confer, or profess to confer, power upon any municipality to subscribe for such stock; and since the power can be obtained only by direct legislative grant, that portion of this act could be applied only to corporations which already possessed the power under some other law. Like the *habendum* in a deed, it grants nothing; and without the grant, the *habendum* is useless. Moreover, as the *only* condition upon which towns in this state can extend aid to the construction of railroads is that they become stockholders in such roads ( *Whiting v. Railroad Co., supra*), any act which undertakes to authorize them to extend such aid upon any other terms and conditions, and does not by its own terms require that indispensable condition, is void. And although the de-

fendant company in this case attempted to exchange its stock for bonds of the defendant town, that does not affect the question of the validity of the act. *Rogan v. Watertown, supra.* Nor will it do to say that the town took the power, by the statute, to subscribe for stock, because otherwise a *lawful* contract could not be made, and that the words "terms and conditions" will be construed as meaning *lawful* terms and conditions. *McCullough v. Moss,* 5 Denio, 580; *Hutchinson v. Lord,* 1 Wis., 286; *Keep v. Sanderson,* 12 id., 352. 3. That even if said ch. 126 was a valid act, the bonds in question were not issued by authority of law. (1) The vote of the town upon the railroad proposition merely conferred a naked power upon the town officers to contract with the company for its stock on certain terms, and did not of itself create a contract. *Veeder v. Town of Lima,* 19 Wis., 280; *Rochester v. Alfred Bank,* 13 id., 432–9. It is the case of an artificial principal, physically incapable of performing an act essential to the consummation of the contract, but endowed by law with the power of appointing an agent to enter into the contract for it. Such a contract is not completed until the agent has performed the act. Moreover, in this case, the vote of acceptance by the town did not create a contract, nor was there any valid contract between the town and company at the time of the amendment of the constitution, or at the time of the vote to rescind, because the company was not at those times, or at any time previous, under any obligation to build its road from Stevens Point to Portage City, or any part of it, nor had such road in fact been built. The so-called contract was void for want of mutuality. 2 Kent's Com., 447; 1 Parsons on Con., 447–9, 475; Chitty on Con., 13; 2 Pothier on Ob., 18, 21; 1 id., §§ 47, 210, 223–4; 1 Addison on Con., 18; Fry on Specific Performance, § 286; *C. & G. E. R'y Co. v. Dane,* 43 N. Y., 240; *U. & S. R. R. Co. v. Brinckerhoff,* 21 Wend., 139; *Townsend v. Corning,* 23 id., 435; *Livingston v. Rogers,* 1 Caines, 583; *Tucker v. Woods,* 12 Johns., 190; *Keep v. Goodrich,* id., 397; *Wood v. Edwards,* 19 id., 205; 18 Barb., 317; *Aspinwall v. Comm'rs of Daviess Co.,* 22 How. (U. S.), 364; 12 B. Mon.,

144; 22 Ill., 147, 153 et seq.; *U. P. R'y Co. v. Davis Co.*, 6 Kan., 256; *Bradley v. Denton*, 3 Wis., 557; *Greve v. Ganger*, 36 id., 369. The acceptance of the proposition by the town was at most a continuing offer, which did not become binding until the company had either built its road or promised to build it, notwithstanding the failure of the original condition. And at any time before there was a contract binding upon the parties, the town might withdraw its offer, or might be deprived of the power to enter into such a contract. (2) The constitutional amendment of 1874, having been adopted before there was any valid contract between the town and company, deprived the town of power to contract except within the limitations prescribed by that amendment; and this incapacity of the principal revoked the authority of the town officers as to its agents to subscribe for stock and issue the bonds. Story on Agency, § 481, and cases there cited; *Eycleshimer v. Van Antwerp*, 13 Wis., 547; *Greve v. Ganger, supra.* The vote of the town in April, 1875, pursuant to ch. 317 of 1874, would also have been effectual to revoke such authority and the offer of the town, if that effect had not already been produced by the constitutional amendment. That act of revocation, and the statute under which the vote was taken, were valid if there was no existing valid contract; and even if there had been a stock subscription by the town, the act might be upheld as a statute of limitation. *Terry v. Anderson*, 95 U. S. (5 Otto), 628.

*L. S. Dixon* and *Edwin H. Abbott*, for the respondent, contended, 1. That even if the defendant town might have maintained the present action, this plaintiff could not. *Judd v. Fox Lake*, 28 Wis., 483, and cases there cited. 2. That ch. 126 of 1869 was valid, and authorized the town to subscribe for stock and issue its bonds. (1) No statute should be declared invalid as a violation of the constitution unless the repugnancy is manifest and unavoidable. *Fletcher v. Peck*, 6 Cranch, 87, 128; *Dartmouth College v. Woodward*, 4 Wheat., 518, 625; *Butler v. Pennsylvania*, 10 How., 402; *Bank of Hamilton v. Dudley's Lessee*, 2 Pet., 526; *Warren v. Charlestown*, 2 Gray, 84, 98; *Norwich v. County Com-*

*missioners*, 13 Pick., 60, 61; *Ex parte McCollum*, 1 Cow., 550, 564; *People v. Draper*, 15 N. Y., 543; *Dickson v. The State*, 1 Wis., 122, 126; *Smith v. Mariner*, 5 id., 551, 580; *State ex rel. Brayton v. Merriman*, 6 id., 14, 22; *In re Richard Oliver*, 17 id., 681, 682; *Mills v. Charleton*, 29 id., 400; *Mil. Ind. School v. Milwaukee County*, 40 id., 328. And where the constitutionality of a statute is in question, it is to be so construed *ut res magis valeat quam pereat:* a rule of universal application in the construction even of mere private writings, but specially necessary in construing legislative acts. Bac. Max., Reg. 3; Broom's Leg. Max., 540, 541; Shep. Touch., 84; Wharton on Agency, §§ 223, 512, 523; *Langston v. Langston*, 2 Cl. & Fin., 194, 242. (2) If some parts of ch. 126 of 1869 might be construed as authorizing an agreement to aid the railroad company on terms forbidden by the constitution, nevertheless the other parts, authorizing a grant of aid upon the constitutional terms on which such aid was actually voted in this case, would stand. *Lynch v. Steamer Economy*, 27 Wis., 69, 72; *Slauson v. Racine*, 13 id., 398; *Bank of Hamilton v. Dudley's Lessee, supra.* (3) The statute authorizes the issue of bonds only "upon such terms and conditions as shall be agreed upon," etc. (sec. 1), and in the next section specifies " terms, conditions and considerations." This plainly negatives any legislative intent to authorize a donation; and sec. 7 plainly contemplates that the company shall give the municipality shares of its capital stock, bonds, or other securities, in exchange for the municipal bonds. (4) The words "terms and conditions" should be construed as signifying *lawful* terms and conditions. Unlawful intent cannot be imputed even to private individuals from the use of these words in written instruments. *Norton v. Kearney*, 10 Wis., 443, 450, 451; *Rogan v. Watertown*, 30 id., 259, 266; *Kellogg v. Slauson*, 1 Kern., 302, 305; *Nye v. Van Husen*, 6 Mich., 329. Much less can it be imputed to a legislative body. (5) The statute might properly authorize *bonds*, as well as stock, of the railroad company to be received in exchange for the town bonds. In *Whiting v. R. R. Co.*, indeed, only the receiving

of stock of the railroad company is spoken of as constituting ownership of the road and relieving the transaction of the character of a donation; but this was not intended as a decision that the town could not take bonds of the company. Such bonds are a higher security than the stock, and represent a superior right; and it seems plain that if the town may be empowered to exchange its bonds for stock of the company, it may be empowered to exchange such bonds for a better security, a safer and surer interest and property, of the same general nature, in the road and franchises. No distinction of this kind appears ever to have been suggested, although statutes couched in language similar to that here in question have existed in this state almost from the beginning, and several of them have passed successfully the scrutiny of this court, as in *Sup. of Iowa Co. v. R. R. Co.*, 24 Wis., 93; *Lawson v. Railway Co.*, 30 id., 597; *Oleson v. Railway Co.*, 36 id., 383; *Lawson v. Schnellen*, 33 id., 288. If any ground for such a distinction ever existed, it is now too late to take it. *Oleson v. Railway Co.*, *supra; Phillips v. Town of Albany*, 28 Wis., 340. But even if the legislature had no power to authorize the issue of town bonds in exchange for railroad bonds, it is enough that the act confers the power to exchange town bonds for stock of the railroad company, which is the power here actually exercised. 3. That the acceptance by the voters of the town of a definite proposition submitted to them, fixing in all their details the terms and conditions of the agreement, and leaving nothing to be directed, assented to or controlled by the town officers, constituted an executory contract between the town and the railroad company. It was a contract like that entered into by the county officers in *County of Moultrie v. Savings Bank*, 92 U. S., 31; and like that considered in *Douglas Co. v. Walbridge*, 38 Wis., 192. See also *Lawson v. Schnellen*, 33 Wis., 288, 298. Nor was the agreement unilateral. If it did not bind the company to build the road *in any event*, it would have been unilateral until the company had entered on the performance of the work, though not afterwards. But the proposal and its acceptance themselves

created a valid, though contingent, obligation on the company to build the road as proposed. Such conditional contracts are always held valid. See *Greve v. Ganger*, 36 Wis., 369. The condition in this contract was inserted solely for the benefit and protection of the road; and was one which the company could and did waive. *Supervisors v. Wis. Cen. R. R. Co.*, 121 Mass., 460. Again, if the acceptance of the proposition was a mere offer of the town, which, until accepted or acted upon by the company, might have been withdrawn by the town, yet the court below found that there was such acceptance, and action taken and work done by the railroad company on the faith and credit of the offer, long before any attempt by the town to withdraw the offer. This, at least, made it a binding contract between the parties; and the company performed and completed the work within the time prescribed by the contract, which required it to commence the road within six months, and complete it within two years, after the deposit of the municipal bonds in the trustee bank. 4. That if the foregoing proposition is correct, neither the constitutional amendment of 1874, nor ch. 317 of the laws of that year, could affect the case. Besides, ch. 317 is not an amendment of ch. 126 of 1869, but of ch. 182 of 1872, and did not apply to propositions made and accepted under the former act.

COLE, J. I. This action was brought in March, 1877, by the plaintiff, in his own behalf, and on behalf of all others similarly interested, as tax-payers, for the purpose of having adjudged void a subscription by the defendant *Town of Plainfield* to the capital stock of the defendant railway company, and to have the bonds of the town issued in payment of such capital stock declared void and canceled. The subscription to the stock was made under and by virtue of ch. 126, Laws of 1869, as amended by ch. 31, Laws of 1871. The plaintiff insists that the subscription and bonds were void, because ch. 126 was never passed by the assembly, and consequently never became a law. The argument in support of this position is briefly this: By the first clause of sec. 10, art. IV of the constitution,

each house of the legislature is required to keep a journal of
its proceedings and publish the same.   The statute makes it
the duty of the chief clerk of each house, within ten days after
the close of each session, to furnish the public printer with a
correct copy of the journals of their respective houses for pub-
lication.   Tay Stats., ch. 6, § 33.   An examination of the as-
sembly journal, it is claimed, fails to show the final passage
by that body of ch. 126.   This objection is not sustained by
the journal to which reference is made.   The journal shows
that bill No. 181 (which was subsequently enacted as ch. 126),
was introduced in the senate, passed that body, and was sent
to the assembly for its concurrence.   It appears that it was
read the first and second time in the assembly, and referred.
After going through the various stages of legislation, it was
read the third time in the assembly, and concurred in.   All
this plainly appears in the assembly journal.   There is obvi-
ously a mere clerical error in the entry in the journal on page
727, in using the singular instead of the plural form of the
verb.   But the word " was " evidently refers to each and all
of the senate bills immediately preceding.   Besides the satis-
factory evidence furnished by the journal itself, of its passage
by the assembly, we find the law published in the bound vol-
ume of the session laws, verified by the secretary of state; and
the presumption of course is, that the bill became a law pur-
suant to the requirements of the constitution.   On this point,
we were referred, by the learned counsel for the plaintiff, to
the cases of *Town of Ottawa v. Perkins*, 94 U. S. R., 260; and
*The People ex rel. Purdy v. Com'rs of Highways, etc.*, 54 N.
Y., 276.   The facts in those cases are so dissimilar to those in
the one before us, that the decisions made there are quite im-
pertinent.   The constitutional provisions under consideration
in those cases required that on the passage of the bills in ques-
tion the vote should be taken by ayes and noes, and entered on
the journal.   The journal failed to contain the proper entries,
and did not show, therefore, that the acts were passed in the
mode prescribed by the constitution.   But there is nothing of
the kind in this case.   On the facts here, we must presume

Bound vs. The Wisconsin Central Railroad Company and others.

that the law was properly passed; and that presumption is not overthrown, but strengthened, by what we find in the journal relating to the matter. These remarks are all we deem it necessary to make on overruling the first objection.

II. The next objection taken to the validity of the subscription is, that even though ch. 126 was properly passed by the assembly, yet, within the rule laid down in the cases of *Whiting v. Railway Co.*, 25 Wis., 167, and *Rogan v. The City of Watertown*, 30 id., 259, it is unconstitutional and void, because it attempts to authorize a donation of aid to a railroad corporation, and does not authorize a subscription to its capital stock. This objection raises a more serious question, and one upon which the members of this court are divided in opinion. A majority of the court, however, think that this objection cannot prevail. It may be proper to remark at the outset, that it is necessary, in the further consideration of this point, to bear in mind the precise question raised by the record, which must be decided. And that is, whether ch. 126, under any fair construction which can be placed upon it, authorized the town to subscribe for the capital stock of the railroad company, and issue its bonds to pay for such subscription. For it is the validity of that transaction which we are called to pass upon, and not whether the town could make a donation of its bonds to the company. If the bonds were issued as a donation, they would doubtless be void, and the plaintiff would be entitled to the relief asked; while, if issued to pay for a stock subscription which the town had power to make, they would be valid obligations, and such relief would be denied. Does, then, the law authorize the subscription which was actually made, and the issuing of the bonds to pay for the same?

By the first section of the act, as amended, it is made lawful for the proper officers of any county, through any portion of which any part of the Wisconsin Central Railroad should run, or the officers of any town in or near such county, to levy a tax upon all the taxable property in such county or town to aid in the location and construction of any portion of such road, and for the purchase of right of way, and depot grounds.

and for like purposes, to issue the bonds of such county or town, in such sums and upon such terms and conditions as shall be agreed upon by and between such county or town and the railroad company, but no such tax (except a tax for the purchase of the right of way, and depot grounds, and for location) shall be levied, nor bonds issued, by any such county or town, unless a majority of the legal voters of the county or town, voting on the question, shall first have voted in favor of the tax, or the issuing of the bonds, as provided in the act. The next section provides that, whenever the railroad company shall require aid from any county or town, it shall make and deliver to the clerk of the board of supervisors of such county, or to the town clerk, as the case may be, a definite proposition in writing, signed by the president or secretary of the company, and sealed with its common seal, which proposition shall contain a distinct statement of the amount of money or bonds desired, and the terms, conditions and considerations upon which the same will be required to be paid and delivered to the company. Upon receiving the proposition, the clerk of the board or town shall, within ten days, give notice of an election to be held at a designated time and place, which notice shall contain a full statement of the proposition made by the railroad company, and shall call upon the voters to deposit a ballot on which shall be written or printed the words, " for the railroad proposition," or the words, " against the railroad proposition." The next two sections of the act prescribe the manner in which the election shall be held, and votes canvassed, and it is provided that, if a majority of the legal voters who shall vote on the question, vote for the railroad proposition, it shall be the duty of the proper officers of such county or town to cause the tax or bonds so voted to be raised or issued, to be delivered to the railroad company on the performance by said company of the terms or considerations contained in its proposition. The seventh section provides, that all shares of the capital stock, or bonds, or other securities, given by the railroad to any county or town, may be taken, held, sold and transferred, by such county or town, in the same manner and with

like effect as can be done by individuals, and upon such terms and conditions as shall have been agreed upon between such county or town and the railroad company. Then, provision is made for levying a sufficient tax annually to pay the interest on the bonds, and to create a sinking fund to pay the principal thereof when the same shall become due and payable. These are the material parts of the act; and the question is, Do they not authorize the subscription which was made in this case? The learned counsel for the defendants contend, that from various clauses in the act, the intention is manifest, that a subscription to the capital stock, and not a donation, is authorized and contemplated. They argue and insist that all parts of the act must be examined to determine its scope and meaning; and they say that it is the duty of the court to place upon the statute a construction which will sustain and reconcile it, if possible, with the constitution. There is no doubt of the pertinency and correctness of the rule of construction relied on by counsel. The chief justice, in the recent case of the *Attorney General v. Eau Claire*, 37 Wis., 400–438, thus states the rule upon this subject: " We owe great deference to the legislative authority. It is our duty to give effect to all its enactments, according to its intention, as far as we have constitutional right and power. And to that end it behooves us, as far as we are able, to place such a construction on statutes as will reconcile them to the constitution, and to give them effective operation under the constitution, according to the intention with which they are passed. It would be a palpable violation of judicial duty and propriety, to seek in a statute a construction in conflict with the constitution, or with the object of its enactment; or to admit such a construction when the statute is fairly susceptible of another in accord with the constitution and the legislative intention." Bearing in mind this familiar rule of construction, let us examine the different clauses relied on by defendant's counsel to sustain their view of the act. In the first section, it will be noticed, the town is authorized to levy a tax or issue its bonds "to aid," etc., in such sums, and " upon such terms and conditions as

shall be agreed upon" between it and the railroad company. In the next section, when the company desired aid from the town, it was required to submit a definite proposition, containing a distinct statement of the amount of money and bonds desired, "and the terms and conditions and considerations upon which the same would be required to be paid and delivered." These clauses, it is argued, qualify and limit the authority "to aid" — especially the word "considerations," used in the second clause,— showing that it was intended some valuable consideration or equivalent should be made or given by the railroad company to the town for the aid received. A donation means, giving something gratuitously, or without consideration. The words here used repel all inference or presumption that a donation was intended or authorized. This reasoning has very great force, and becomes conclusive when considered in connection with the significant language used in section seven. This section, we think, relates back to the prior sections, qualifying their effect and serving to explain their meaning. The seventh section speaks of the shares of capital stock held by the town, and declares how such shares may be sold and transferred, language quite out of place in the law, having nothing to operate on, if no subscription to stock was authorized by the act. But it is objected that the words "terms, conditions and considerations" do not confine the railroad proposition to a lawful subscription of stock, but may be satisfied by any unlawful terms and conditions which may be agreed upon between the town and the railroad company. But would it not be quite inadmissible for the court to assume, that the "terms, conditions and considerations," which the legislature authorized the railroad company to make, and the town to accept, related to or contemplated some unlawful arrangement or agreement, and not a lawful one? It has often been decided by this court, that the legislature might authorize towns and counties to subscribe to the capital stock of a railroad company, and levy taxes to pay for such subscription. It has also been as deliberately held, that the legislature could not confer upon such bodies corporate power to issue their

bonds or raise money by taxation for the purpose of making a donation to a railroad corporation. And, it seems to us, we cannot infer from anything in this act that an unlawful power was intended to be granted. Our conclusion, therefore, is, that the power conferred by the language, that the town may aid in the location and construction of a railroad, by the issue of its bonds on such terms, conditions and considerations as the town and railroad may agree upon, implies a lawful power, one to be exercised within legal limits under the constitution.

On the argument, the case of *The Attorney General v. Eau Claire, supra,* was referred to as having a bearing upon the construction of the statute before us. That was an injunction bill filed in this court to restrain the defendant city from constructing a dam across the Chippewa river, and issuing its bonds to pay for the same. The dam was about to be built under an act of the legislature. But the court held the law invalid, because it could not determine from the act itself whether the intent was to authorize the erection and maintenance of a dam for a public municipal purpose, or for a private use; that, while the city was authorized to erect the dam, the law left it optional with the city whether it should be used for a public or for a merely private purpose. That decision does not seem to have any very direct application to the case before us. For here, as we construe the statute, it does not "grant an equivocal power, subject to the election of the grantee for one of two purposes, the one lawful and the other unlawful."

III. In January, 1872, the defendant railway, desiring aid from the *Town of Plainfield,* submitted to the town a proposition, in substance, that it would build its road from Stevens Point to the city of Portage, a distance of about seventy-five miles, providing the municipal corporations along or adjacent to the road would vote to take, and would take, the stock of the company to the amount of $300,000, in exchange for their bonds; and that the town would subscribe $20,000 to its capital stock, and issue its bonds in payment therefor. The

bonds of the town and certificates of stock were to be deposited with the trustee in trust, until the company performed the conditions specified in its proposition, and made ready for use a continuous railway from Stevens Point through the town. On receiving this proposition, the town clerk published a notice, as required by law, for an election by the legal voters to vote on the proposition. At an election held January 31, 1872, pursuant to the notice given by the clerk, a majority of the votes cast was in favor of the proposition. The railroad proposition was submitted to the other towns along the road, and they refused to subscribe for more than $184,500 in all, including the subscription of the *Town of Plainfield.* In April, 1875, before the company had built its road through the town and earned the bonds, the same proposition was again submitted to the voters of the town, under ch. 317, Laws of 1874, and by a majority vote was rescinded. The railroad company commenced the work of grading and constructing its road in 1873, but did not fully complete the whole line for use through the town, according to the terms and conditions of its proposition, until January, 1876. Now it is claimed by the plaintiff's counsel, that the vote of the town in 1872, accepting the proposition as submitted, did not constitute a binding legal obligation upon the parties; that the acceptance of it by the town was nothing more than an acceptance of an option on the part of the company to build its road or not; and that whatever authority was conferred upon the town officers by the vote in 1872 to make the subscription, was wholly revoked by the adoption of the amendment to sec. 3, art. XI of the constitution, in 1874, and by the rescinding vote taken in April, 1875.

In a number of cases which have come before this court, it has, in effect, been decided, that a proposition for aid, submitted by a railroad company to the voters of a town or city, and accepted by the voters, becomes a contract mutually binding upon the railroad company and the town. *Phillips v. The Town of Albany,* 28 Wis., 340; *Lawson v. The Mil. & Northern R'y,* 30 id., 597; *Lawson v. Schnellen,* 33 id., 288; *Board*

*of Supervisors of Douglas Co. v. Walbridge*, 38 id., 179; and *The Town of Platteville v. The Galena & Southern Wis. R'y Co.*, 43 id., 493. In the last case it was held, that the railway company was bound to build its road according to the line designated in its proposition, and, in case of a feeble company of doubtful ability to build any road between the terminal points of its charter, the company was restrained, at the suit of a municipality which had subscribed for stock and issued its bonds in aid of the proposed main line, from wasting its means in constructing branch roads so as to disable it to build such main line, and from diverting such line. See also *The Supervisors v. Wis. Central R'y*, 121 Mass., 460; and *Town of East Lincoln v. Davenport*, 94 U. S., 801. If the effect of the acceptance of the railroad proposition by the town was to make a contract, it is very plain that such contract could not afterwards be rescinded by the electors of the town. Nor would the obligation of such contract be affected by the constitutional amendment adopted in 1874. *County of Moultrie v. The Savings Bank*, 92 U. S., 631. It is said, however, that the railroad was not bound by its proposition to build its road, unless and until the municipalities along the line had subscribed and taken $300,000 of its capital stock, which they never did do. It is very obvious that this condition was one for the benefit of the company, and which it might waive. The company, in fact, completed its road as proposed, and became entitled to the bonds which the town issued. It was solely in its option to refuse to build the road if the entire subscription was not obtained. But, having seen fit to waive that condition, and fully execute its proposition without that aid being furnished, no subscribing town has any ground to complain. Indeed, in this case, it is not the town which is seeking to rescind the subscription and cancel the bonds. The town seems willing to abide by its contract. The point was made on the argument, that an individual tax-payer of the town, upon the facts stated in the complaint, could not maintain this action. Being against the plaintiff on the merits of the case, we have not

felt called upon to consider this objection, and it is left open for future consideration.

It follows from these views, that the judgment of the circuit court must be affirmed.

RYAN, C. J. It is the settled doctrine of this court, that, when a tax deed is about to issue on a tax invalid for some cause going to its foundation, the owner of the land may proceed in equity to enjoin it. *Marsh v. Supervisors*, 42 Wis., 502. It is perhaps to be regretted that such cases were not left to be determined in actions at law, when the tax deed could be impeached at law on the ground for which it is enjoined in equity. It is, however, quite too late to restrict this jurisdiction now.

The jurisdiction has been, perhaps inadvertently, extended to cases not quite within the rule. It may be that this extension of the jurisdiction cannot now be disturbed. But I think that it ought not to be extended.

I have been able to find no case in this court, and I think that there is none, except perhaps *Peck v. School District*, 21 Wis., 523, which appears to be an exceptional case in every respect, where an action by a single tax-payer, either for himself or for himself and others with like interest, to enjoin the collection of an entire tax, has been upheld. Such an action would be apparently as much beyond the plaintiff's right, as one by a single tax-payer to enjoin the execution of all tax deeds upon an invalid tax.

Actions have been upheld by a single tax-payer, in behalf of himself and others in like interest, to enjoin municipal authorities from issuing negotiable securities, creating a municipal debt to be repaid by taxation. *Whiting v. Railroad Co.*, 25 Wis., 167. Generally, when a wrong is threatened against the whole body of a corporation, the remedy is primarily in the corporation itself; and a single corporator can proceed only upon refusal of the governing body to act. And perhaps the true ground of sustaining actions of the nature of *Whiting v. Railroad Co.*, without averment of demand and refusal of the

governing body to act, is that the governing body itself is about to do the wrong. *Dousman v. Mining Co.*, 40 Wis., 418.

But when the securities have been actually issued, it appears to me that, on the general principle, a single tax-payer can maintain an action to cancel the securities, in the hands of third persons, and the contract on which they were issued, if at all, only upon averment of demand and refusal of the governing body of the corporation to act. Such an action involves the whole right, and the whole right is in the corporation at large. Primarily, therefore, the right of action is in the corporation; and the nature of the action does not imply the refusal of the governing body to act, or the right of the tax-payer to proceed for the wrong to the whole corporation.

The cases in this court leave this question in some uncertainty. It was probably in one of the cases decided in *Rochester v. Alfred Bank*, 13 Wis., 432. There were two actions, one by the town, and the other by a tax-payer; and both are decided together, and sustained. The printed cases remaining here do not give the pleadings; but it is improbable, in the circumstances, that a demand and refusal of the town to act was averred in the complaint of the tax-payer. The difficulty is not alluded to in the opinion, which apparently proceeds throughout upon the right of the corporation, the town; and throws no light upon the ground on which two contemporaneous actions, one by the corporation and one by the tax-payer, were both sustained. The same question appears to have been in *Sauerhering v. Railroad Co.*, 25 Wis., 447, where it is also overlooked; the court deciding against the plaintiff on the merits. The question may have been in other cases, but I have found none in which it has been passed upon. And there are certainly some cases looking strongly the other way. *Judd v. Fox Lake*, 28 Wis., 583; *West v. Ballard*, 32 Wis., 168.

In this state of the decisions, counsel appears to have raised the question in *Lawson v. Railway Co.*, 30 Wis., 597; but the court declined to pass upon it, deciding against the plaintiff on other grounds.

In the present case, the appellant seeks to cancel the contract and the securities of the town issued under it, and to enjoin the collection of a tax for payment of the securities, without any averment of demand or refusal of the governing body of the town to act. And I am disposed to think that he has gone beyond his right.

He does not aver that any tax deed is about to issue, to work a cloud upon the title of his realty; but only that the treasurer will levy upon and sell his goods and chattels for the payment of the tax which he impeaches. And, notwithstanding *Peck v. School District*, it is the settled doctrine of this court that equity will not restrain the sale of personal property for taxes. *Van Cott v. Supervisors*, 18 Wis., 247; *State Bank v. Milwaukee*, id., 281; *C. & N. W. R'y Co. v. Fort Howard*, 21 id., 44; *Lenz v. Charlton*, 23 id., 478; *Quinney v. Stockbridge*, 33 id., 505.

For these reasons I am not prepared to dissent from the judgment in this case.

The majority of the court, however, place the judgment upon an entirely different ground; the validity under the constitution of ch. 126 of 1869; to which I cannot assent. This statute was before the court in *Lawson v. Schnellen*, 33 Wis., 288; but its validity is not considered or adjudged. The question appears, therefore, to be an open one.

The distinguished gentleman who represented the bondholders on the argument, warned the court, with great emphasis, against repudiation. That is the key-word of the cant of speculators in questionable public securities. It was hurled at this court when it rendered just judgment upon sound principle in *Clark v. Janesville*, 10 Wis., 136; *Rochester v. Alfred Bank*, 13 id., 432; *Berliner v. Waterloo*, 14 id., 378; *Veeder v. Lima*, 19 id., 280, and perhaps other cases. *Gelpcke v. Dubuque*, 1 Wall., 175. That word of reproach, any such word of reproach, can have no influence on the mind of any judge fit to hold his office. It is as much the duty of courts to avoid illegal, as to enforce legal contracts. Courts have nothing to do with the consequences of judgments rendered on settled

AUGUST TERM, 1878. 569

Bound vs. The Wisconsin Central Railroad Company and others.

principles of law. Far better that these bondholders should lose their money invested in these bonds, than that principles of judicial decision should lose their control of the judgments of the court. It is the strict duty of this court to pass upon the validity of the statute under which the bonds in this case were issued, upon fixed rules of judicial decision, in disregard of all outcry from counsel, clients or others. And it would be far better and more honorable to this court to encounter the slang of repudiation, than to earn the reputation, as may have happened to other courts, of being a court of claims for speculators in abortive evidences of public debt in Wall street or elsewhere. Such a threat — it sounded like one — can have no influence on me to swerve a line from what I believe to be the law or my duty to declare it at all hazards. Unfortunate the court wanting in courage to declare unpalatable right against pretentious, plausible wrong.

In saying this, I am not unmindful of the duty so to deal with the statute in question, if possible, *ut res magis valeat quam pereat.* "We owe great deference to the legislative authority. It is our duty to give effect to all its enactments according to its intention, as far as we have constitutional right and power. And to that end it behooves us, as far as we are able, to place such a construction on statutes as will reconcile them to the constitution, and to give them effective operation, under the constitution, according to the intention with which they are passed. It would be a palpable violation of judicial duty and propriety, to seek in a statute a construction in conflict with the constitution or with the object of its enactment; or to admit such a construction when the statute is fairly susceptible of another in accord with the constitution and the legislative intention." *Att'y General v. Eau Claire,* 37 Wis., 400.

In the same case it is said of a legislative grant of power: "It is certain that if the power be alternative and optional, either for a public or for a private use — to construct a dam, to be used, when constructed, either for the purpose of water works or for the purpose of leasing the water power for man-

ufacturing purposes, in the discretion of the city, — it cannot be upheld. It seems too plain for discussion, that if the legislature grant an equivocal power, subject to the election of the grantee, for either one or other of two purposes, the one lawful and the other unlawful, the power cannot be upheld upon the chance of its being lawfully applied. In such a case the election is inherent in the grant, and cannot be separated from it. The validity or invalidity of the use resting in the subsequent discretion of the grantee, the power cannot be aided by anything *dehors* the grant itself. The discretion is in the statute; and the statute must be construed in the light of the discretion to put the work authorized to an unlawful use. When the purpose of such a statute is double, each purpose must be valid, to sustain the power. The case is not that of a statute valid in part and void in part. In such a grant as we are considering, the valid and void purposes are inseparable; and the void purpose taints the whole statute. The case is not that of a statute susceptible of two constructions, the one valid and the other void. In such a statute as we are considering, the duplicity is not in construction, but in the power granted. Construction has done its office when it finds the discretion in the grant. And it is impossible to uphold a franchise granted to impose a public burden, lawful or unlawful at the election of the corporation to which it is granted; to construct and maintain a dam at public expense, to be applied either to a public or a private use, as the city may see fit to determine." These are not my words. They are the words of the court, for that is the very rule governing the case. The court solemnly adopted this canon of construction; and I am not willing to bend it or break it, to meet the exigencies of any case. And by this rule of construction, I propose to test the statute now before the court.

This statute authorizes the appellant and other municipalities to levy taxes and issue bonds to aid in the location and construction of the railroad, and for the purchase of right of way and depot grounds for it, in such sums and upon such terms and conditions and considerations, as may be agreed

upon between the municipalities and the railway company
In this statement of the power, I transfer the word *consider-
ations* from the second section to the first, because the two
sections are dependent. And I am inclined to think that that
word excludes mere gratuity to the railroad company, if the
words *terms and conditions,* of the first section, do not of
themselves. But there is no word in the statute having any
tendency to put a limit to the nature of the terms and condi-
tions and considerations on which the parties may agree, ex-
cept that they must go to aid in the location and construction
of the road. There must be terms and conditions and con-
siderations; and the considerations must perhaps be in favor
of the municipality. But there is nothing in the language of
the statute to preclude such considerations, in a thousand dif-
ferent forms, as were condemned in *Whiting v. Railroad Co.,*
25 Wis., 167, as insufficient to support such a power. In
*Phillips v. Albany,* 28 Wis., 340, Dixon, C. J., expresses re-
gret that this court had ever sustained municipal subscrip-
tions to the stock of railroad companies. And the same great
judge in that case refers to and affirms what he had said in
*Whiting v. Railroad Co.,* to point the distinction between
stock subscriptions and donations or *other* appropriations of
public money to railroad companies.

"The city, town or county becomes a part owner of the
road, to the extent of the stock taken, and, the work being
one which the public might have engaged in as the sole owner,
and paid for entirely out of the public funds, it has been con-
sidered that there was no valid objection to its becoming a
part owner thereof as a stockholder in a private corporation
which has undertaken to do the same work. To the extent of
the stock taken, the city, town or county is directly interested
and benefited by the money expended in the work, the same
being a matter of public concern, and it is, in our judgment,
upon this principle, and this alone, that the taxation in that
class of cases can be sustained." *Whiting v. Railroad Co.*
This is not the language merely of the late chief justice; it
takes weight because it comes from him, but it is the lan-

guage of the court, for it was the very point of decision. And the doctrine of *Phillips v. Albany*, and incidentally of *Whiting v. Railroad Co.*, is again affirmed by Mr. Justice COLE, speaking for the court, in *Lawson v. Railway Co., supra.*

In *Whiting v. Railroad Co.*, there was a valuable consideration for municipal aid authorized by the statute: cheap transportation for the inhabitants of the municipality. Of course there may be innumerable considerations of like character for municipal aid. But the principle of that case is, that municipal subscription to the stock makes the road *pro tanto* a public road, which may therefore be built *pro tanto* at municipal cost, and that no other consideration will support municipal aid to it. There is no such limit in the statute in question. It leaves the whole question of aid, its terms and conditions and considerations, without a word of restriction, to any agreement which the parties may make. It therefore makes a stronger case for the rule of *Att'y Gen. v. Eau Claire*, than the statute in that case. There, there was a power for a double purpose, one public and one private. Here there is a comprehensive power, with one lawful and numberless unlawful purposes; a power "link'd with one virtue and a thousand crimes." And this power to issue municipal bonds and tax municipal property, for good and evil, for one public and for many private purposes, is clearly void under the decision of *Att'y Gen. v. Eau Claire.*

It is true that the execution of the power here was for the public purpose. But that does not aid the construction of the statute. If the power be double, for lawful and unlawful purposes, it is bad for all purposes. A statute of such a character cannot be held good for one purpose and bad for another; making the validity of the statute dependent, not on its construction, but upon what is done under its authority. The duplicity is in the power, and is fatal to it. No construction can remove the duplicity inherent in it, and no execution of it can redeem it from the vice essential to it. What might be valid under a valid statute, cannot be supported under an invalid statute. The statute and the execution of the statute

must both be valid. A single provision in a statute cannot be constitutional or unconstitutional, in different cases, merely because it is put to different uses. It is constitutional or unconstitutional upon its construction, on its face, before it is put to any use, and independent of any use to which it may be put.

- This appears so apparent to me that, had not the court held otherwise, I should be inclined to call any attempt to sustain the statute by forced construction, absurd. It can be sustained, not by construction, but by interpolation; reading the terms, conditions and considerations of the statute, as *lawful* terms, conditions and considerations. The statute implies no such limitation. It leaves the terms, conditions and considerations absolutely to the agreement of the parties; leaves the validity of the terms and considerations absolutely to the judgment of the parties; those being limited only to aid to the railroad; not otherwise at all limited by the nature of the terms, conditions and considerations themselves. The statute commits the whole subject to agreement of the parties; leaving them free to make any agreement of any character for the purpose of aiding the railroad. There is no other limit in the language of the statute; no other limit to the agreement to be made. Any other limit does violence to the language of the statute; not merely interpolating a limit which the statute itself does not make, but a limit inconsistent with its terms. It takes from the parties the scope and freedom of agreement which the statute expressly gives them.

As I understand the argument of the respondents, it is, that certain adjudications elsewhere hold that discretionary powers conferred by the expressions, terms and conditions, are to be exercised within legal limits; that the law will not imply an unlawful discretion, not given by express words, and will not defeat a statute by inferring that it contemplated an unlawful act. *Kellogg v. Slauson*, 1 Kernan, 302; *Nye v. Van Huson*, 6 Mich., 329; and perhaps other cases to the same effect.

This mode of interpretation must rest on giving a limit, not inherent in it, to the language of a statute, founded on the

common law or on previous judicial decisions; by taking language, not in its natural sense, but in some established conventional sense. I do not quarrel with the principle; I only deny its effect, as claimed. Statutes of this state are not framed in view of the common law as it prevails in Michigan, New York or elsewhere, or of judicial decisions there. They can take aid only from the common law as it prevails here, from judicial decisions made here only. And decisions of this court, with which the legislature is presumed to have been acquainted, with which it was probably in fact acquainted, gave interpretation, long prior to the passage of this statute, to the words, terms and conditions, in their natural and unlimited sense, which is conceded to be fatal to it.

As early as 1853 it was held, that an assignment for the benefit of creditors, authorizing the assignee to sell in such manner and upon such terms and for such prices as he should deem advisable, was an authority to sell on credit, unlawfully, and fatal to the assignment. The decision turned mainly on the word *terms*, as implying consideration, which was held not to restrict the assignee to lawful terms. *Hutchinson v. Lord*, 1 Wis., 286. This was followed by *Keep v. Sanderson*, 2 id., 42, another case of assignment for the benefit of creditors, where the power was to sell upon such terms and conditions as the assignee might judge best. The doctrine of *Hutchinson v. Lord* was affirmed, and applied to the language of the assignment in the case, terms and conditions. That phrase was held to be sufficiently comprehensive to include an unlawful power to sell on credit, and the assignment was held void for the use of that phrase in the power given to the assignee. It was suggested that these cases were overruled by *Norton v. Kearney*, 10 Wis., 443. But that is a mistake. The language there was, that the assignee should dispose of the property to the best advantage in his discretion; and this is held not to imply the unlawful power to sell on credit. *Hutchinson v. Lord* and *Keep v. Sanderson* are cited and commented upon without a word of dissent. The case then before the court is distinguished from them. And whether that case

were well or ill decided, it does not purport to disturb *Hutch-inson v. Lord* or *Keep v. Sanderson*, but affirms them by im-plication. It is true that the chief justice, who delivers the opinion of the court, comments with approval on *Kellogg v. Slauson* and *Nye v. Van Huson, supra*. But that is merely his own approval of those cases, not necessary to the decision of the court, not expressly dissenting from *Hutchinson v. Lord* and *Keep v. Sanderson*. And the second report of *Keep v. Sanderson*, 12 Wis., 352, puts the authority of those cases beyond question. The decision is unanimous, and shows not only the adherence of the court, but the adherence of the chief justice himself, notwithstanding his personal approval of the New York and Michigan cases, to the rule in *Hutchinson v. Lord* and *Keep v. Sanderson*. And the late Mr. Justice PAINE, who delivered the opinion of the court, says that *Norton v. Kearney* was not intended to overrule, and did not overrule, *Hutchinson v. Lord* or *Keep v. Sanderson;* the court adher-ing to the construction there given to the phrase, terms and conditions, as not confined to lawful terms or conditions.

And it may be remarked, that the construction of *Hutchin-son v. Lord* and *Keep v. Sanderson* is very clearly recog-nized by the late chief justice, in his opinion in *Rogan v. Watertown*, 30 Wis., 259.

This was the state of the law by an unbroken series of de-cisions, when the statute in this case was passed, and entered into it. And when the legislature used the unlimited phrase, so interpreted by a series of decisions in this court, they must be held to have used it in the light of those decisions, as a power limited only by the agreement of the parties, and not limited by any rule of law; as a power to agree upon any terms and conditions which the courts might hold to be valid or invalid in the law. And this construction appears to me to have been the intention of the legislature, apparent in and out of the statute.

For in the statute itself, there is not only power to levy taxes and issue bonds to aid in the location and construction of the railroad generally, which would go to the general fund

of the railroad company, but also express power to levy taxes and issue bonds for the purchase of right of way and depot grounds, which would naturally go, not to the railroad company, but to the vendors. I understand this to be conceded on the argument by the learned counsel for the railroad company. But he argued that the purchase of right of way and depot grounds, by the municipalities, with public money, for the use of the railroad, does not imply a conveyance of them by the municipality to the railroad company, the title remaining in the municipality, and the use in the railroad company; and that, therefore, it would not be a gift. It would be a gift of the use in perpetuity, if not of the fee; would be a gift for a private purpose; and would be equally within the condemnation of *Whiting v. Railroad Co.* It is only by municipal subscription to the stock that a railroad can become a public work to support taxation or the payment of public money.

And so there is here clearly embraced in the general power, within the general scope of the terms, conditions and considerations of the statute, an express power to do one thing of the character which the decision of the court holds to be impliedly excluded from the terms and conditions, because not lawful. It appears to me, with all deference to the better judgment of the court, that the legislature has expressly shown the sense in which it used the phrase, terms and conditions, beyond the power of the court to limit it by mere construction.

Of course, the legislative intention is to govern, so far as it can be discovered from the language of the statute, aided by other legislation *in pari materia*, especially contemporaneous legislation. "It is well settled, that, in construing a doubtful statute, and for the purpose of arriving at the legislative intent, all acts on the same subject-matter are to be taken together and examined, in order to arrive at the same result. 'All acts *in pari materia*,' said Lord MANSFIELD, 'are to be taken together, as if they were one law.' 'Where,' he said on another occasion, 'there are different statutes *in pari materia*,

though made at different times, or even expired, and not referring to each other, they shall be taken and construed together as one system, and as explanatory of each other.' And in various other cases before him, Lord MANSFIELD applied this doctrine to the laws concerning church leases, bankrupts, and the poor." Sedgwick on Statutes, 209.

After all, the question may be well asked, why, if the legislature intended to restrict this grant of power to lawful purposes, it did not restrict it so in terms? I think the legislation of the same session effectually and conclusively answers this question. When the legislature of 1869 intended to limit powers of like general character, it did limit them. It is so limited in ch. 113 and ch. 134, Gen. Laws, and in ch. 90, P. & L. Laws of that year. It is not so limited in ch. 126, ch. 130, or ch. 188, Gen. Laws; or by chapts. 183, 201, 203, 287, 348, 380, 436, or 454, P. & L. Laws. Many of these latter statutes expressly authorize mere donations to railroad companies of bonds or money raised by tax. And it appears to me to be outside of all reasonable argument, to contend that the legislature, by implication, intended to exclude uses of the power in this case within its terms, out of regard for the law which it expressly authorized in contemporaneous statutes *in pari materia*. That is giving a construction to the legislative conscience, which the legislature itself has expressly rejected; judging of its intention, not by what it did, but by what it did not. If this had been a mere argument at the bar, I would speak of it in terms unbecoming a criticism of a judicial decision.

The first section of the statute, and the power, were amended in 1871, in a way not material here. In the mean time *Whiting v. Railroad Co.* was decided. And the learned counsel for the railroad company ingeniously suggested that the re-enactment of the power went to show that the legislature did not regard it as inconsistent with the judgment of this court in that case. To me it appears that if, in the reënactment of the section, the legislature had regard for that decision, it would have cured it of its duplicity in the amendment.

Sec. 7 of the statute is claimed to limit the power to an exchange of municipal bonds for stock, bonds or other securities of the railroad company. I cannot think so.

I shall not consider the question whether an exchange of railroad bonds for municipal bonds would support the latter. Clearly they would not, under the doctrine of *Whiting v. Railroad Co.* There are some cases in the court in which the question might have arisen, but was overlooked. I know of no case in which the validity of such an exchange of bonds has been asserted in the court. I, for one, agree with the late chief justice that it is unfortunate that municipal aid to extramunicipal railroads has ever been sustained; and I am unwilling to extend the doctrine. But, in the present case, I will assume that an exchange of bonds would be a valid consideration to support municipal taxation. In that light I will consider sec. 7.

That section is clearly independent. It is merely permissive. *Attorney General v. Eau Claire, supra.* It has no tendency to limit the power of secs. 1 and 2, to an exchange of securities. It simply assumes that the power comprehends, not that it is limited to, such an exchange. And it merely permits municipal disposition of such securities, when the exchange happens to be made under the power.

But the section furnishes its own argument in support of my view of the power. For it provides for the disposition of securities held by a municipality, upon such *terms and conditions* as may be agreed upon between the municipality and the railroad company. The term is plainly used in the same sense as in secs. 1 and 2; and clearly means unreserved terms and conditions; terms and conditions unlimited except by agreement. This appears still more conclusively to be the true construction, because the power to dispose of the securities gives the right to do so in the same manner and with like effect as individuals, upon the terms and conditions of the agreement. This appears to me plainly to imply that the double limitation on the power of disposition is of like character; as the right of disposition is to be such as individuals could exercise, so

the terms and conditions are of like scope; and that the agreement itself, authorized by the statute, between the municipality and the railroad company, is, as its terms import, such as an individual might make. I owe great deference to the majority of the court; but I cannot see how any one can read the statute and put any limit upon the phrase, terms and conditions, except that it shall be founded on municipal aid to the railroad company, in any manner that may be agreed on; any limit against the construction of the words in *Hutchinson v. Lord* and *Keep v. Sanderson.*

I deplore the decision on this point; not merely because I think it wrong, but because I am apprehensive that it will be classed with such cases as *Newcomb v. Smith,* 2 Pin., 131; *Re Booth,* 3 Wis., 13; *Kneeland v. Milwaukee,* 15 id., 454; *State v. Main,* 16 id., 398; *Brodhead v. Milwaukee,* 19 id., 624; *Gillespie v. Palmer,* 20 id., 544; which have long been made a reproach to the court, as judgments proceeding upon policy rather than upon principle.

In the other points discussed in the opinion of the court, I entirely concur.

*By the Court.* — Judgment affirmed.

A motion by the appellant for a rehearing was denied.