By the Court.
Okey, Owen and Follett, JJ., concurring. The question to be determined in this case is whether the provisions of the act of 1883, commonly called the Scott law, entitled “ an act further to provide against evils resulting from the traffic in intoxicating liquors ” (80 Ohio L. 164; 39 Ohio St. 399), amended in 1884 (81 Ohio L. 200), which provide for levying and collecting an assessment or tax on the business of trafficking in intoxicating liquors, constitute an enactment which is in any respect valid, or whether such provisions- are void upon the ground that they are in conflict with the 18th *347 section of the schedule to the constitution, which reads as follows : “ No license to traffic in intoxicating liquors shall hereafter be granted in this state, but the general assembly may by law provide against evils resulting therefrom.”
The proper construction of that constitutional provision was carefully considered in State v. Hipp, 38 Ohio St. 199. There the validity of the act of 1882, “more effectually to provide against the evils resulting from the traffic in intoxicating liquors ” (75 Ohio L. 66; 38 Ohio St. 199), commonly called the Pond law, was directly involved. That act contained no words which in terms provided for a license. On the contrary, it expressly provided that nothing in the act should be construed as a repeal of existing statutes, “ nor shall anything in this act be construed or held to authorize or license, in any way, the sale of intoxicating liquors.” Nevertheless, this court held in that case, “ that the constitutionality of a statute depends upon its operation and effect, and not upon the form it may be made to assume ” ; that “ this inhibition of the constitution applies to all departments of the government and restrains the legislature from granting licenses for such purpose, whatever form of legislation may be adopted that “ an act violating the true intent and meaning of the instrument, although it may not be within the letter, is as much within the purview and effect of a prohibition as if within the strict letter that “ an act in evasion of the terms of the constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose, is as clearly void as if in terms forbidden;” that the Pond law, so called, “which requires every person engaged or engaging in such traffic to pay a specified sum of money annually, and execute a bond as therein required, and also provides that£ every person who shall engage or continue in such traffic without having executed the bond, ... or after his bond shall have been adjudged forfeited, . . . shall be deemed guilty of a misdemeanor,’ is in its operation and effect, as to the traffic not already prohibited, a license, within the inhibition of the section of the constitution which pro *348 vides that ‘ no license to traffic in intoxicating liquors shall hereafter be granted in this state,’ and is therefore void.”
In Butzman v. Whitbeck, ante, 223, this court considered the question whether the principles enunciated in State v. Hipp were applicable to the Scott law. That act provides, among other things, that there shall be an annual assessment of $200 on the traffic in liquors generally, and $100 where the traffic is confined to malt and vinous liquors ; that the assessment shall be a lien upon the property in which the traffic is carried on ; and that “ whoever shall engage or continue in the business aforesaid of selling intoxicating liquors in or upon land or premises not owned by him, and without the written consent of the owner thereof,” is guilty of a misdemeanor, and may be fined or imprisoned, or both. Upon the fullest consideration we held in Butzman v. Whitbeck, that the principles declared in State v. Hipp were strictly applicable to those provisions; and hence, that the Scott law, “ so far as it provides for a lien on real estate occupied by a tenant who is a dealer in liquors, is in effect such license law, and therefore unconstitutional, whether the lease be executed before or after the passage of the act, and i(t will make no difference that the owner, in any case, has consented in writing to such traffic.” And in our opinion that position is impregnable. Either Butzman v. Whitbech was decided right or State v. Hipp was decided wrong. But both are right. The state, in the Scott law, says in effect to the tenant, procure the written consent of the owner of the premises, comply with the other requisites of the act, and observe the other restrictions upon the traffic, and you may sell alcoholic liquors by the drink without hindrance or molestation, and thus secure all the privilege there ever was in a liquor license ; but if you carry on the traffic without the written consent of the owner, you shall be punished as a criminal. To be sure, it is suggested that this is merely regulation, and the provision is likened to that requiring a written order to a minor under the liquor law of 1854. But a decisive answer to the suggestion is found in the fact that the provision for such order to a minor left in the dealer the lawful right to carry on the traffic, and his bnsi *349 ness did not become unlawful by a failure, on his part, to observe the provision. Under the Scott law, however, if a tenant carries on such business without the written consent of the owner, he is engaged in an unlawful business and may be fined and imprisoned as a criminal. These provisions of the acts of 1854 and 1883, examined together, furnish an excellent illustration of the distinction between license and regulation. Surely if the provision quoted from the Pond law constituted that act a license law, much more does the above provision from the Scott law constitute that act a license law, with respect to any lien upon lands occupied by tenants ; and any attempt, however labored, to distinguish between the two acts in this respect, in any matter of principle, will necessarily fail. So, the claim that it is not a license, because the right to sell is open to all who will comply with the statute, is answered by the fact that every license provided for in our statutes is subject to the same objection. Take the case of a peddler. If he pays the money demanded he is entitled to a license, and the right is open to all. If a statute in terms provided for a liquor license to all who would pay $200 annually, would the act be any the less a violation of the constitution because the right to the license was open to all ? To state the question is to answer it.
Finding the Scott law to be unconstitutional to the extent stated, and the case then before us not requiring us to determine as to the effect such invalidity must have upon the remaining portions of the act, or whether the act is in any other respect beyond legislative power, wé declared in Butzman v. Whitbeck that the act was unconstitutional, so far as it provided for a lien on premises occupied by tenants, and we expressed no opinion as to the validity of the act, except as thus stated. But the cases now before us require us to determine whether the act, so far as it provides for an assessment or tax, is in any respect a valid enactment, or whether, in view of the fact that the act is invalid as respects the lien upon premise occupied by tenants, the whole act, so far as it provides for such assessment or tax, should be held unconstitutional. In State ex rel. v. Sinks, application is made by the state on *350 relation of George W. Conrey, a dealer in liquors in Miami' county, to compel, by mandamus, David Sinks, treasurer of-that county, to receive his assessment for the current year, to enable him to carry on such traffic in accordance with the terms of the statute, the treasurer having refused to receive such tax on the ground that the act is unconstitutional. This was precisely the mode in which the question was raised in one of the cases reported under the title of State v. Hipp. The question is also directly presented.in other cases argued and submitted with State v. Sinks, in which dealers in liquors seek to enjoin county treasurers from enforcing the assessment or tax.
The question being thus directly presented whether the Scott law is in any respect valid, so far as it provides for an assessment or tax on dealers in ' liquors, it has been again’' argued orally and on briefs, and we have bestowed upon it the utmost care. We have seen that the act is invalid, so far as it provides for a lien on premises occupied by tenants. That is the decision in Butzman v. Whitbeck, decided in June of this year, and we unhesitatingly adhere to it as a satisfactory expression of our views on that question. If we assume a proposition upon which we express no opinion, namely, that the act would have been constitutional if the legislature had passed-the act, with the words stricken therefrom which were held invalid in that case, it does not follow that any part of the act-can be supported in this case. The question before us is-entirely different, and it may be properly stated in this form : Is it unreasonable and improbable that the legislature would have passed the act with the provision we have held to be unconstitutional stricken therefrom ? If this proposition must be answered in the affirmative, it is plainly our duty to hold - this act to be unconstitutional and void, so far as- it provides for such assessment or tax. The leading case in support of this view is Warren v. Charlestown, 2 Gray, 84, in which Shaw, C. J., after referring to the well settled rule that a statute may be in part unconstitutional and in part constitutional, - stated the qualification to the rule, in these terms: “But this must be taken with this limitation that the - parts- so' held, *351 respectively constitutional and unconstitutional, must be wholly independent of each other. But if they are so mutually connected with, and dependent on each other, as conditions, considerations or compensations for each other, as to warrant a belief that the legislature intended them as a whole, and that if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them.” And then, having examined the provisions of the act in detail, the principle so stated by the chief justice was applied. “ Having come to the conclusion,” said he, “ for the reasons before stated, that the act is incompatible with the letter and spirit of the constitution, in its important provisions, we are constrained to hold the act inoperative and void.” In the subsequent case of Jones v. Rollins, 8 Gray, 329, 339, the same eminent judge, following Warren v. Charlestown, said: “ ¥e think, therefore, that the two parts of the enactment were not separate and independent of each other, but the one may have been the motive, inducement or consideration on which the other was founded, and they must stand or fall together.” In Lathrop v. Mills, 19 Cal. 513, 530, Baldwin, J., approving Warren v. Charlestown, said : “ It is true the constitution merely interdicts acts which oppose its provisions, and that if in any act there can be found a provision which is constitutional, that provision may be carried out, provided the excepted provision is entirely disconnected from the vicious portions of the act, and the legislature is presumed to intend that notwithstanding the invalidity of the other parts of the act, still this particular section shall stand. The saving of the particular provision, even when not upon its face unconstitutional in such instances, is therefore a matter of legislative intent. In order to sustain the excepted clause, we must intend that the legislature, knowing that the other provisions of the statute would fall, still willed that the particular section should stand as the law of the land.” Indeed, Warren v. Charlestown has been followed and approved in many cases, and quoted with approbation by standard text writers. It is sufficient to refer to Sparhawk v. Sparhawk, *352 116 Mass. 315, 326; State v. Perry County, 5 Ohio St. 497; State v. Hipp, supra; People v. Cooper, 83 Ill. 585, 595; Hinze v. People, 92 Ill. 406; Cornell v. People, 107 Ill. 372, 384; State v. Dousman, 28 Wis. 541; Dells v. Kennedy, 49 Wis. 555 ; Exp. Towles, 48 Texas, 413, 442; Meshmeier v. State, 11 Ind. 482; Neely v. State, 4 Baxter, 174; Cooley’s Const. L. (5th ed.) 213, 214, 222; Bishop’s Written Laws, §34.
The inquiry, according to the rule stated by Chief Justice Shaw, is, whether the legislature intended the provisions of this act, as a tax law, should take effect as a whole, and whether any of those provisions would have been passed if it had been believed that all could not take effect. It is therefore important to ascertain how that inquiry must be determined. We cannot inquire of the individual members of the legislature, or enter into their thoughts for the purpose of ascertaining their views; and yet we are not without means to solve this inquiry. Ample means, indeed, are afforded to all. In order to correctly determine this question, it is necessary to understand the state of the law and the evils supposed to exist at the time the Scott law was passed. In his work on Statutory Crimes, § 77 (approved in State v. Vanderbilt, 37 Ohio St. 590, 643), Mr. Bishop says: Courts “ do not close their eyes to what they know of the history of the country and of the law, of the state of the law at a particular time, of the public necessities felt, and other like things.” “ Courts, in construing a statute,” said Davis, J., in United States v. U. P. R'y Co., 91 U. S. 72, 79, “ may with propriety recur to the history of the time when it was passed ; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it.”
Prom the earliest period in the history of the state until the passage of the Pond law in 1882, the right to sell intoxicating liquors in quantities of one quart and upward, where the liquor was not to be drank at the place where sold, was left practically untouched by legislative enactment. That act having been declared to be unconstitutional, the Scott law was passed tne next year. That, as we have seen, is an act pro- *353 Tiding a special tax on the business of trafficking in liquors, and it extends to traffic of the kind just alluded to, that is, where the liquors are sold in considerable quantity, to be drank elsewhere than the place of sale. But during the larger part of our territorial period, and during the entire period of our state government, down to the passage of the Scott law in 1883, there was never a moment when it was lawful to sell alcoholic liquors by the drink without a license ; and, of course, since the adoption of the present constitution, there can be no license. So far as the right to traffic in liquors was concerned, authority to sell by the drink was the license, and all there was of it. In one thing, at least, the legislature had been entirely consistent, during a period of more than thirty years, and until the passage of the Scott law, and that was in denying all authority to sell alcoholic liquors by the drink, upon any condition or under any circumstances, and severe and gradually increasing penalties by fine and imprisonment were, from time to time, provided against all persons who made such sales. At the time the Scott law was passed, the act in force provided that for a single offense of that sort, there might be a fine of $50 or imprisonment for thirty days, and in fact the punishment might be as severe as in case of a sale to a minor or an intoxicated person. True, in a few counties of the state, this penal provision was practically disregarded, but in other parts of the state it was enforced, and the convictions for a violation of the provision greatly outnumbered, in many counties, the convictions for all other offenses.
In view of these well known facts, it is fair to say — what everybody knows — that the great objection which the legislature had to the passage of the Scott law, was the fact, that by complying with its terms and obeying the other restrictions upon the traffic, a dealer in acoholic liquors acquired the right to sell such liquors by the drink ; and these objections would never have been surrendered, except for the fact that the act provided for special taxes upon the traffic, which taxes, in the aggregate, would yield a very large annual revenue, and also provided a method for the collection of such taxes, from rich and poor alike, so certain and sure that apparently no part of *354 the taxes would be lost. That method was to make the tax a lien on the real estate in which the traffic is or may be carried on, enforceable, if need be, by sale of the property. Of course, where the dealer was the owner of the property, there was no difficulty, for the tax could be made a lien on his property. The problem was to determine how the tax could be made effectual where the dealer was a tenant. This class, it was well known, was large, and the necessity for a lien on the premises, in case of a tenant, is, ordinarily, vastly more important than in the case of an owner. Many such tenants are entirely responsible, but all are not so. Indeed it is by no means improbable that some of such tenants have no greater interest in the personal property in their possession than in the real estate they occupy, and without such lien it would be practically impossible to collect from them any such tax. Moreover, with a tax without such lien, the temptation of this class of tenants to multiply, thus increasing the number of objectionable dealers, would be very strong. The plan adopted, as we have seen, was to make it a condition precedent to the lawful prosecution of such business by a tenant, that he should obtain the written consent of his landlord to the prosecution of the traffic, and to punish any attempt of the tenant to prosecute the business, without consent, as a criminal offense. This, it was supposed, would furnish ample security for the tax, through the lien that would be thus fastened on the real estate, and it was also thought that few dealers who were very objectionable could obtain such writing. For these reasons, it is fair to say, and no other, the Scott law was passed ; and nothing is clearer to our minds than that without such provision for a lien'on premises occupied by tenants, no considerable number of either branch of the general assembly would have been willing to pass that act, repealing, as it purports to do, the provision against selling by the drink, which had been frequently changed, but had remained in force so many years. To induce the passage of the act, it was necessary, not only that a tax on the business should be provided for, but that a mode of collection, apparently sure and certain, should also be provided ; and we repeat, we are confident that without such *355 provision as to tenants, the act would not have received any considerable number of votes in either branch of the general assembly. In saying so, we do not wish to be understood as speaking in a censorious spirit, but simply as expressing our views as to the importance that must have been attached to the provision in question.
The provision as to a lien on premises occupied by tenants being clearly unconstitutional, can there be any doubt as to the effect of the invalidity on the remaining parts of the act, so far as they provide for such assessment or tax? We are clear there can be no doubt on the subject. The legislature evidently regarded the clause as to tenants vital, and the act never would, have been passed without it, and that clause being unconstitutional the whole act, as a tax law, entirely fails. If we had doubts upon this question we would resolve them in favor of the validity of the act, but we have no such doubts.
It is urged, however, that the constitutionality of the Scott law has been sustained by this court in the case of State v. Frame, 39 Ohio St. 399. This is undoubtedly true; but, while we have the greatest respect for the judges who concurred in that holding, there exist, in our opinion, satisfactory reasons why we should not feel bound by the decision. 1. Unfortunately, when the case was heard, the chief justice was necessarily detained at his home at Ironton. True, he was furnished with the records and arguments as they were filed, and after a full and careful consideration of the points involved» concurred in the decision. This he caused to be noted at the end of the opinion of the majority (39 Ohio St. 417). Moreover he was very familiar with the whole subject, having heard the arguments, taken part in the decision and delivered a dissenting opinion in State v. Hipp. We make no criticism on either the right or propriety of his action in this respect. Neither of us would have hesitated to do the same thing. But when the decision is urged as a finality, the fact is important. In cases involving the jurisdiction and practice of the court, we frequently deny a motion, or affirm or reverse a judgment, on a point not made or argued by counsel, though even this is never done until every judge has had ample opportunity to *356 express bis views as to the question of jurisdiction or practice. King v. Cappeller, ante, 218, is an instance. In cases not belonging to that class, the same thing has been done (State v. George, 34 Ohio St. 657, 665), though not frequently ; and, as a general rule, with respect to cases other than those relating to the mere jurisdiction and practice of the court, those are best decided which are best argued. In Exp: Bushnell, 9 Ohio St. 77, 97, Attorney General Wolcott, speaking of the advantages of an orderly oral discussion, says it is “ the best mode which the wit of man has yet devised for eliciting the truth as between contending parties ”; and there is no examination more satisfactory than that which a cause thus argued receives at the hand of judges able and willing, and acting in concert for such purpose. When, therefore, State v. Frame is urged as binding authority, the fact should be remembered that the cause was fully and ably orally argued before four judges alone, that it was discussed and considered by four judges in concert, that it was determined by four judges, and that one of the four delivered a dissenting opinion. That these facts detract from State v. Frame as binding authority is well settled. Roads v. Symmes, 1 Ohio, 281, 316; Chestnut v. Shane, 16 Ohio, 599; Bloom v. Richards, 2 Ohio St. 287, 405. 2. The decision in State v. Frame is in direct and irreconcilable conflict with State v. Hipp. The court in State v. Frame, disregarded the sound principle asserted subsequently in Butzman v. Whitbeck, but always existing, that “ stability of judicial decisions of- a court of last resort upon all questions, especially upon questions of great public concern, is one of the safeguards of popular government.” In reasserting that principle and affirming our ruling in Butzman v. Whitbeck, we find the present an appropriate occasion to approve and reaffirm the doctrines maintained in State v. Hipp, and therefore it becomes our plain duty to overrule State v. Frame and Benner v. Bauder.
It has been urged, furthermore, that even regarding State v. Frame as clearly erroneous, we should consider it as binding under the Me of stare decisis. Much reliance has been placed on Kneeland v. Milwaukee, 15 Wis. 454, in support of this *357 claim, in which it was sought to apply that principle to legislation of the same general character." 'Aside from the fact that the decision falls somewhat short of sustaining the point to which it is cited, it will be seen that in Hound v. Wisconsin Gen. R. R., 45 Wis. 543, 579, Ryan, C. J., one of the ablest jurists of the country, took occasion to say of that and two or three other Wisconsin cases, that they “ have long been a reproach to the court, as judgments proceeding upon policy rather than principle.” The rule of stare decisis properly applies where a decision has become a rule of property. This court asserted it a few days ago in the case of Arrowsmith v. Harmoning, ante, 253. But the rule has no application to cases involving the construction of those parts of the organic law which guai'antee the rights of, or impose burdens upon the citizen. Willis v. Owen, 43 Texas, 11. Indeed, the idea that, so far as the judicial power is concerned, the citizen shall be burdened forever with an unconstitutional annual tax, simply because a majority of this court,last year, declared the tax to be valid,finds little support in the cases upon the subject and none whatever in reason. With respect to decisions upon questions of this character, while they are entitled to great respect, and should never be overturned unless clearly wrong, yet they cannot be regarded as absolutely binding when the same question is again presented.
Finally, it is urged that the legislative department has had the Scott law under consideration, and not only failed to repeal it, but re-enacted sections 2 and 9, in a modified form, and made provision for the expenditure of a portion of the revenue to be derived from the enforcement of the act, in the creation of an intermediate penitentiary. 81 Ohio Laws, 204, 206. The statement is entirely correct. It was sought by these changes to mitigate, to some extent, what were claimed to be oppressive features in the act as originally passed, and to provide for the expenditure of part of the revenue arising from the act, in the way stated. This amounted to a declaration that the legislative department, as at present constituted, was willing that the act, thus modified, should remain in force, if it was free from constitutional objection. And as the legis *358 lature which enacted the Scott law had necessarily determined it to be constitutional, and as a majority of this court, in State v. Frame, had held the act to be constitutional, the present General Assembly might well decline to repeal that act on the sole ground that it was unconstitutional. Moreover, we may fairly say that the legislature must have been aware of the well-known fact that, notwithstanding the decision in State v. Frame, legal means would, be resorted to for the purpose of resisting the enforcement of the act on the grounds of its unconstitutionality, and that this court would inevitably be called upon to consider anew the question of the validity of the act. Under the circumstances stated, we do not regard the action of the legislature, in 1884, upon this subject, as having rightfully any effect on the question before us.
.Whether or not sections 10 and 11 of the Scott law (80 Ohio Laws, 167), and section 9 of the same act as amended in 1884 (81 Ohio Laws, 204), or either of those sections, fall with the other provisions of those acts, present important questions which have not been argued, and hence we have not considered them with any view to their determination in this ease.
It is a delicate and responsible thing to overrule a former decision, and declare an act of the general assembly to be unconstitutional. A majority of the judges of this court, as now constituted, repeatedly concurred in judgments declaring acts to be unconstitutional, and repeatedly reversed or qualified former decisions, in cases which it was thought required that action. The power is not to be exercised in either case", until the judges concurring in the decision are clearly satisfied that the former decision is wrong, or the statute in irreconcilable con. flict with the organic law. The written instrument called the Constitution of Ohio is, with respect to our state legislation, the supreme law of the land, binding in all its parts equally upon the legislative, the executive and judicial departments, and it means the same thing to-day that it meant when it was adopted. The power to provide against evils resulting from the traffic in liquors, in terms conferred upon the legislature by that instrument, would seem on well settled principles to be exclusive, and we approve the opinion of Thurman, Oh. J., *359 in Miller v. State, 3 Ohio St. 475, as to the nature of the power expressly granted. Certain it is, however, that the provision has no relation to the traffic in intoxicants for medicinal, sacramental or mechanical purposes, for no evils resulted from such traffic; but it was directed against evils resulting from the traffic in liquors as beverages, and it is a power to regulate. Of course, the legislature is to judge as to the manner in which provision shall be made against such evils, but this must be done subject to such limitations, expressed or implied, as exist against the power. Loan Association v. Topeka, 20 Wall. 655, 663; Cincinnati, &c. Railroad Company v. Clinton County, 1 Ohio St. 77. One of these limitations is found in the very section by which the power is granted, that is, provision shall not be made against such evils by granting licenses. As, in our judgment, the act with its amendment is, in effect, clearly, plainly, palpably a license law, within the meaning of the constitutional inhibition, we are compelled so to declare, for we are vested with no discretion in such a case ; and as State v. Frame and Benner v. Bander are in this view necessarily erroneous, we are compelled to overrule them, and in this respect also we are vested with no discretion. Whether it is possible to enact a special liquor tax law, which will not be in conflict with the clause of the constitution as to licenses, or some other provision of that instrument, is a question upon which we do not express any opinion. It is sufficient to say, for the reasons already given, that the Scott law is not such an act, but, on the contrary, as an assessment or tax law, it is wholly void.

Writ of mandamus refused.

Johnson, C. J.
By the organic law, a majority of this court may pronounce a decision. When so pronounced, it is equally binding as if the court was unanimous ; even though it may not appear to be supported by either reason or authority.
Being unable to agree with the majority, either in the result reached in this case or in the reasoning employed, I deem it an imperative duty in view of the consequences result *360 ing to place upon record 'Some of the reasons for my dissent.
The questions presented by the record of these cases are :
First: Is the Scott law an unconstitutional exercise of the faxing power of the general assembly ?
Second: Is it a license law, and so within the inhibition of the eighteenth section of the schedule to the constitution, which provides that: “No license to traffic in intoxicating liquors shall hereafter be granted in this state, but the general assembly may by law'provide against the evils resulting therefrom ?” Four several times have these provisions of the constitution been under consideration, after having been ably argued both orally and by brief, by the best legal talent of the state ; once in the Hipp case, a second time in the Frame case, a third time in King v. Cappellar and Butzman v. Whitbeck, and a fourth time in the present cases.
In the Hipp case it was held by a majority of the_ court that the Pond law was in effect a license law. In the Frame case it was held by a majority of the court that the Scott law was not a license law, and that it was valid as an assessment upon the traffic; also that the second section did not operate as a lien on real property on which business was conducted by a tenant where the lease was executed before the passage of the act.
In King v. Cappellar and Butzman v. Whitbeck, the same questions were presented for our decision, but were left, by the present majority of the court undecided, for reasons given in their reports of those cases.
The former case, King v. Cappeller went off on the alleged ground, not presented at bar but raised sua sponte by the judges concurring, that the petition did not state facts sufficient to constitute a case of action. In the latter case these questions were still unanswered by the majority, they simply holding, that the lavs' so far as it provided for a lien on real estate occupied by a tenant who was a dealer in liquors, is in effect a license law, whether the lease be executed before or after the passage of the act, even though the landlord has consented in writing to such traffic
*361 Whether the act was in any other sense unconstitutional was not answered, because it was alleged -that the constitutional questions above stated were not presented by the record. That this assumption was untenable is shown by the record and the dissenting opinion. In the eases at bar, the majority expressly declined to express any opinion upon those questions, they remain as heretofore unsettled, unless, as I claim, the decisions in the Frame case and in Benner v. Bauder, 39 Ohio St. 399, are not in fact overruled.
1. In those cases, these two constitutional questions were squarely and unequivocally answered. It was there held that the act authorizing annual assessments upon the business of trafficking in intoxicating liquors, is a valid and constitutional enactment, within the taxing power and the legislative power to provide against the evils resulting from such traffic, vested in the general assembly. In the present cases, the same questions are again presented by the record — they are fairly stated by the majority in the following terms :
“ The question to be determined in this case is whether the provisions of the act of 1883, commonly called the Scott law, entitled 'an act further to provide against evils resulting from the traffic in intoxicating liquors’ (80 Ohio Laws, 164; 39 Ohio St. 399), amended in 1884 (81 Ohio Laws, 204), which pro vide for levying and collecting an assessment or tax on the business of trafficking in intoxicating liquors, constitute an enactment which is in any respect valid, or whether such provisions are void, upon the ground that they are in conflict with the 18th section of the schedule to the constitution, which is as follows: ‘ No license to traffic in intoxicating liquors shall hereafter be granted in this state, but- the general assembly may by law provide against evils resulting therefrom.’ ”
The object of bringing the present cases before us was the same as it was in the cases before us in June last, namely ; to review and reverse the decision in the Frame case and in Benner v. Bauder, and to once more determine whether the Scott law was within the taxing power, or of the legislative power to control the liquor traffic. The majority now again decline to consider or determine these questions, and so far as *362 any direct attack upon the law is made the decision in the Frame case remains in full force. It is true, it is stated in the syllabus that the doctrine of that case is overruled, but in looking into the opinion it will be seen that in express terms it is held, that the law is void by reason of the invalidity of the lien clause, and not from want of any legislative power to tax the traffic or to provide against the evils resulting from such traffic by levying assessments upon the business. So far as the present decision goes, the validity of the act in this respect is assumed, and it is declared void solely on the ground that the lien clause, as against a landlord, is a license, and therefore the whole act must fall for the reason stated in the second point of the syllabus. To say, that the present decision declares the act unconstitutional, is a misnomer, as it nowhere discusses either of the constitutional questions of the law, and they are left to-day as they were in June last, undetermined. In these respects the law is assumed to be valid. The doctrine of Butzman v. Whitbeck, as to the invalidity of the lien clause as against the landlord, is again asserted, and the court proceeds to state the question they in fact decide, as follows :
“Finding the Scott law to be unconstitutional to the extent stated, and the case then before us not requiring us to determine as to the effect such invalidity must have upon the remaining portions of the act, or whether the act is in any other respect beyond legislative power, we declared, in Butzman v. Whitbeck, that the act was unconstitutional, so far as it provided for a lien on premises occupied by tenants, and we expressed no opinion as to the validity of the act, except as thus stated. But the cases now before us require us to determine whether the act, so far as it provides for an assessment or tax, is in any respect a valid enactment, or whether, in view of the fact that the act is invalid as respects the lien upon the premises occupied by tenants, the whole act, so far as it provides for such assessment or tax, should be held unconstitutional.” Again : “ If we assume a proposition upon which we express no opinion, namely, that the act would have been constitutional if the legislature had passed the act with the words stricken therefrom which were held invalid in that case, it does *363 not follow that any part of the act can be supported in this ease. The question before us is entirely different, and it may be properly stated in this form: Is it unreasonable and improbable that the legislature would have passed the act with the provision we have held to be unconstitutional stricken therefrom ? If this proposition must be answered in the affirmative, it is plainly our duty to hold this act to be unconstitutional and void, so far as it provides for such assessment or tax.”
Thus, after stating that these constitutional questions are “ directly presented,” by the present cases, they assume that the law would be valid with the lien clause eliminated, and proceed to state another and different question not involving any consideration of the constitutional provisions stated, but simply as to what is the effect upon the body of the act, of the void lien clause ? Upon this point they hold, that it is plainly unreasonable and improbable that the general assembly would have passed the law with this clause eliminated,” therefore the whole act, so far as it provides for such assessment of tax is unconstitutional and void.
This conclusion is reached by an erroneous application of a common law rule in the interpretation of statutes, incorrectly stated and applied. A statute may be void for such a reason, but cannot be unconstitutional.
In support of the conclusion stated it is said, “We are confident that without such provision as to tenants, the act would not have received ten votes in either branch of the general assembly.”* The grounds for such confident belief as to what members of the legislature would have done in such case are not stated. I am not endowed with this power of ascertaining the legislative mind, aside from the application of the well settled rules for discovering that intention.
I can only say, that such an inquiry outside of the terms of the statute itself is not within the province of this court, and that so far as I know, this is the first time in the history of jurisprudence where the attempt has been made to go outside the terms and provisions of the statute as applied to the sub *364 ject matter to which it relates and arbitrarily say, what the legislature would or would not have done.
The rule sought to be .invoked, when properly stated is, “ Where the provisions of a statute are of such a nature and have such a connection with other parts of the statute as to be essential to the law, its unconstitutionality vitiates the whole enactment, but if there are independent provisions not in their nature and connection essential to the other parts which are unconstitutional, they may be treated as a nullity, leaving the rest of the enactment to stand.” Exchange Bank v. Hines, 3 Ohio St. 1.
In that case, this rule was invoked in order to have this court declare the general tax law of 1853, void, because section 10 allowed individuals and corporations to deduct their debts from their moneys and credits, which deduction was held to be unconstitutional. The court however held that the invalidity of this provision did not affect the remainder of the act where no such deductions were allowed, and stated the rule as above quoted.
That court did not look outside of the statute or into the minds of the members of the legislature, to learn whether the act would or would not have been adopted with section 10 eliminated, but into the general provisions of the act itself. So in the case of Railroad v. Commissoners, 38 Ohio St. 378, the validity of an entire act was challenged because of the invalidity of one of its provisions. That act gave to the county commissioners aright of action to recover damages against any person or corporation obstructing the highway. By a proviso (as is the case of the lien clause of the Scott law), it was enacted that the statute of limitations should not be deemed to have run against any past obstruction of the highway.
It was claimed that this proviso was in violation of a vested right and that where the damages complained of had, before the passage of the act, been barred, it was retroactive, and hence invalid under article 2, section 28 of the constitution, and that clause being invalid the whole act must fall.
But the court say, assuming the proviso is void for that reason,it does not result from this that the whole statute is *365 void: a part of a statute may be void from want of conformity with the constitution and the remainder valid.
“ Whether or not the infirmity avoids or affects the entire act depends upon the connection and dependence on each other of its various provisions. Where they are so inseparably connected and so related to each other as to give rise to the presumption that a part would not have been enacted without the whole, the entire act is void, but where no such connection or dependence exis'ts, that part of the statute not in itself in conflict with any constitutional provisions, is as valid as if independently enacted.”
The court then holds (Okey, J., concurring), that this proviso is not so connected with the body of the act that it would not have been passed without the clause relating to the limitation of action. In that case the court might well have said, if it had been within its province to express an opinion, that the “ act would not have received ten votes in either branch of the general assembly ” without such proviso.
As was said in MacNeal v. Dombaugh, 20 Ohio St. 167-175, “ The meaning of the legislature must be gathered from all they have said, as well from that which is ineffectiial for .want of power ais that which is authorized by law.”
So, in a recent case, it is held that part of an ordinance may be held void and the remainder valid. Pigua v. Zimmerman, 35 Ohio St. 507. The ordinance contained two sections, the first made it unlawful to keep open on Sunday, places for the sale of liquor, and fixed a penalty for such offense; the second section prescribed what acts should be deemed prima facie evidence, of a violation of this ordinance.
It was conceded that this section was invalid, and it was claimed, that for that reason, the whole ordinance was void, but the court say, “ that circumstance does not affect the provisions of the first section, unless the. two sections are so connected in their subject' matter as to lead to the inference that the first would not have been adopted without the second. Where a statute consists of severable and independent partshaving no general influence oyer one another and a part is valid and a part void, the part which is valid will be carried into effect.”
*366 It will be seen that the rule as stated in the foregoing cases is radically different from the one applied to nullify the present act. It requires the court to look to all the provisions of the statiote, to see whether they are so dependent or independent of each other that if one be unconstitutional the other shall be declared so, because, operating alone, they fail to accomplish the purpose of the statute or render it so unjust in its opei'ation as to give rise to the presumption that the legislature intended it to operate as a whole, or not at all.
This is the rule, not only as settled in Ohio, but as stated in all the standard text books, and the decisions of every respectable court outside of Ohio. It is believed no case can be found, and certainly none has been cited by the majority, which supports the second proposition of their syllabus.
This proposition would apply with equal force to the provisions of a statute that are severable and independent, as well as where they are dependent. It may be and often is, the fact, that in order to secure votes sufficient to pass several independent statutes they must be incorporated into one act, and the fact, that either alone, could not have received votes sufficient to make it a law without incorporating the others, does not render the act void, nor does it warrant a court, in looking into this outside fact of which it can only conjecture, to determine the validity of the whole, aside from the dependence or independence of its several provisions. The power of this court to declare the will of the people, as expressed in an act of the legislature to be unconstitutional is a, grave one, which never should be exercised unless it is plainly and irreconcilably in conflict with that instrument.
Such a power exists in our system of government and is wise and of great public utility when properly employed, but it should never be invoked without the clearest conviction of the invalidity of the act. While it is a wise and conservative power, it is also a dangerous one, and doubly so, when, as in the present case, a law is nullified because the court conjectures that it would not have been passed with the lien clause, which is wholly independent of the other provisions of the act eliminated.
*367 Mr. Sedgwick in bis able treatises, on statutory and constitutional construction, devotes an entire chapter to the dangers incident to going outside of the provisions of the statute itself, to ascertain its legal intent and effect.
He says on pp. 242-3 : “ It may very well be that in the condition of English jurisprudence in former times, when laws were few and rarely passed, when the business of legislation was confined to a small and select class, to which practically the judiciary belonged, when the legislative and the judicial bodies sat in the same place, and indeed in the same building, in such a state of things, it may be well that the judiciary might suppose themselves to possess, might indeed really possess, a considerable personal knowledge of the legislative intent, and that they might come almost to consider themselves as a co-ordinate body with the legislature. But in modern societies, when the division of political authority is so much more nice and rigorous, where the business of legislation has become multifarious and enormous, and especially in this country, where the j udiciary is so completely separated from the legislature, it must be untrue in fact, that they ean have any personal knowledge sufficient, really sufficient to instruct them as to the legislative intention, and if untrue in fact any general theory or- loose idea of this kind must be dangerous in practice."
The author then adds: “ The result of all our modern decisions is to the effect, that the intention of the legislature is to be found in the statute itself, and that there only, the judges are to look for the mischief meant to be obviated and the remedy meant to be provided.” I have italicised the above citation, see chapter throughout.
So in Paulina's Cargo v. The U. S., 7 Crunch, 52, 60, it is said : “ In construing these laws, it has been truly stated to be the duty of the court to effect the intention of the legislature ; but this intention is to be searched for in the words which the legislature has employed to conyey it."
By this it is not meant that aids to a proper construction, such as statutes in pari materia, and antecedent legislation may not be resorted to when the intention is not clearly expressed. *368 In the case at bar that intention is clearly expressed in the lien clause. The only question here is, what is the effect on the other provisions of the act to hold that clause void ?
The opinion says, it is unreasonable to presume they would have passed the act without this clause. As well might it be said, that it would not have been passed without the Sunday clause in the ninth section, or without the repeal of the tippling provision of the act of 1854.
If, as must be conceded, evidence is inadmissible to show the legislative motive or intent, á fortiori, a court cannot without evidence or any personal knowledge of which it can take judicial notice, deal in conjecture.
2. In the dissenting opinion of Judge Mcllvaine, in which I concur, it is shown that the lien clause is not so inseparably connected with the other provisions of the statute as to render the whole void because of its invalidity.
That statute expressly provides for the collection of this assessment either by action at law or by distraint against the tenant. In this respect it is exactly like taxation of personal property.
In case of a tenant, the state has the same remedies as if he listed personal property. The lien clause is only an additional mode of collecting the tax. To say, that the whole act as a tax or assessment law must fall because the lien clause falls is at variance with all sound principles.
3. But I do not concur in the holding that 'this lien clause is a license : my reasons for this I stated at large in the Hipp case. Subsequent reflection has not shaken my confidence in the soundness of my dissenting opinion in that case.
The inhibition of the eighteenth section of the schedule is against the general assembly granting a license; this decision makes the consent granted by a landlord a license.
I only desire to add, that since the decision in the Frame case the precise question as to taxing the business and as to license, which is here' involved, has again been before the supreme court of Michigan, 18 Northwestern Reporter, 807.
That case arose under an act of 1875 and was a prosecution for soliciting and taking orders for the sale of liquors in the *369 state by persons outside of the state, without having first paid the tax required by the act, to wit, $100, for malt liquors, and $300, for, alcoholic liquors.
The 3rd section makes it a penal offense to solicit such orders, without having first paid such tax, and subjects the offender to a fine,and upon default of payment imprisonment or both in the discretion of the court. Among other questions it was claimed that this act was in legal effect a license, and so prohibited by the no-lieense clause of the constitution of Michigan which is precisely like ours. The court unanimously hold, sustaining this court in the Frame case and my dissenting opinion in the Hipp case, that “ the imposition of the tax upon the business ... is not a license,” &c.
In the opinion it is said: “ The imposition of the tax on the business . . . is not a license, and is not in violation of the constitution of our state. . . that “the statute does not create or authorize the business, but rather assumes its existance (whether lawful or not can make no difference), and viewing the traffic with disfavor, the legislature of Michigan, as has the law making power of every civilized state and nation, during the last hundred years, by resort to the police power, sought in various ways, to prevent and restrain by its enactments the evils upon the state and society. The statute under consideration belongs to this class of legislation. Its object was to curtail the traffic, show legislative disapproval, and to a certain extent provide revenue to aid in ameliorating the evils which the trade has never failed to entail upon the community. It was for this purpose the tax upon the business was authorized and for the enforcement of its collection the penalty was imposed.”
Surely the unanimous decision of so able a court, is entitled to some consideration, the decision there made is on all fours with that in the Frame case, and is in conflict with the conclusion of the majority in the present case.
Like the Pond law, it makes it a misdemeanor to engage in the business taxed, without first paying the tax.
This decision reaffirms the cases Youngblood v. Sexton,' *370 32 Mich. 406, and Garrison v. Stell, 46 Mich. 98, which arc irreconcilable with the present opinion.
Thns the supreme court of Michigan has thrice affirmed the principles of the Frame case.
4. In order to break the force of the suggestion that we have three judges overruling a decision made by four in the Frame case, an allusion is made to myself by which it is sought to weaken the force of that suggestion. As to the good taste or propriety of that allusion I make no complaint.
How much weight should be given it can be easily determined, when it is remembered that the same constitutional questions were argued at great length both orally and by brief in the Hipp case, and were elaborately considered by the whole court'in which my views were expressed in the dissenting opinion.
The same questions were again considered by me upon briefs in the Frame case, so that little if any additional benefit could be derived from the- oral argument in that case.
Again, much stress is placed upon the benefits of oral arguments. If they be of such vast importance as the majority seem to think, it is an impeachment of the wisdom of all the members of this court from its earliest organization.
The general rule of practice is to hear oral arguments only when so requested.
Fully four-fifths of the cases that have ever been determined by this court have been decided without the benefits of oral argument.
Again, if oral argument is the greatest invention which “ the wit of man has devised,” to shed light upon legal questions, what becomes of the authority and weight of the decis-on of King v. Cappellar ? There the case was determined upon a point not argued either orally or by brief nor relied on by counsel as stated in the dissenting opinion in that case.
In conclusion, I quote with approbation the language of Judge Ranney, one of the greatest lawyers that ever adorned this bench, in his,brief in this case:
“ If judicial decisions and an uninterrupted practice for a quarter of a century can settle anything, it is settled/ (leaving *371 all other considerations aside) that the constitution has imposed no disability upon the general assembly to levy and collect taxes upon the business of trafficking in intoxicating liquors.”

 The words “any considerable number of” have been substituted for “ten” in the opinion since this dissent was filed.